THE TRUSTEES OF THE FREEHOLDERS AND COMMONALTY OF THE TOWN OF SOUTHAMPTON, Respondents. *v.* THE MECOX BAY OYSTER COMPANY, Appellant.

The English possession in this country rested upon the right of discovery, and the lands were held by the king as the representative of the nation.

The Indians had no title which they could grant and which would be recognized in the courts of this country.

The supremacy of the Dutch government was never established over the eastern end of Long Island, and there was no exercise of sovereign power over the lands in that part of the island until the final establishment of the power of England through the government and laws promulgated by the Duke of York.

Under the Andross patent to the town of Southampton, granted in 1676, the title to all the lands vested in the corporate body thereby created.

This title was not changed or altered by the Dongan charter of 1686, but it simply confirmed the title in the town to the common lands, not to individuals as tenants in common.

In the construction of a public charter granted for the purpose of creating a civil community, the practical interpretation it has received from and which has been acquiesced in by those interested therein for a long series of years, is the most important evidence in the determination of rights existing thereunder, and the strict letter of the instrument becomes of little importance.

SICKELS — VOL. LXXI.    1

As to the lands under water embraced within said patents, the title remains in the town.

Where, therefore, in an action by the town, to recover land under water of Mecox bay, in said town, defendant claimed that under the Dongan charter the title to the undivided and unappropriated lands vested in purchasers thereof as tenants in common under a deed executed in 1641 from one F., who claimed to be the agent of the Earl of Stirling, and under Indian deeds, and proved a title from trustees of said purchasers or "proprietors," as they were known and described, which trustees were elected pursuant to the act of 1818 (Chap. 155, Laws of 1818), *held*, that the defense was untenable; and that plaintiffs were entitled to recover.

(Argued March 15, 1889; decided October 8, 1889.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made December 13, 1887, which affirmed a judgment in favor of the plaintiff, entered upon a verdict directed by the court.

This action was in the nature of ejectment to recover land under the waters of Mecox bay, in the town of Southampton, Suffolk county.

The town claimed title to the land under the colonial charters. There were two charters to the town. The first was dated November 1, 1676, and was granted by Governor Andross, The second was granted by Governor Dongan, and was dated December 6, 1686. The first settlers in the town came from Lynn, Massachusetts, about the year 1641. They had obtained a deed from James Farrett, who professed to be the agent or deputy of the Earl of Stirling, who appears to have claimed that he held a grant of Long Island. The Farrett deed conveyed no particular land, but purported to grant to the grantees named therein and their associates the right "to sitt down upon Long Island, there to possess, improve and enjoy eight miles square of land," etc. It further gave the right to purchase from the Indians " any of the aforesaid land or any part thereof." After their settlement on the island these settlers obtained deeds from the Indian occupants. The Andross patent recited the existence of a town upon Long Island " commonly called by the name

of Southampton." It granted, ratified and confirmed unto the patentees named therein, " for and on the behalf of themselves and their associates, freeholders and inhabitants of said town, all the aforementioned tract of land, etc., within the bounds of the town. To have and to hold all and singular  \*  \*  \* etc., to the said patentees and their associates, their heirs, successors and assigns. Provided  \*  \*  \*  that all the lands, etc., within the said limits shall have relation to the town in general for the well government thereof." It gave the right to purchase the Indian title, and conferred upon " said patentees and their associates all the privileges and immunities belonging to a town within this government." The Dongan patent recited the Andross patent, and that differences existed between the inhabitants and Indians concerning the bounds of the town, and that the clauses in the Andross patent constituting a town were not sufficient to give such privileges and immunities as it was designed to give. It granted, ratified and confirmed unto the patentees therein named " freeholders and inhabitants of Southampton, hereinafter erected and made a body corporate and politique, and entitled to be called by the name of the trustees of the freeholders and commonalty of the town of Southampton and their successors, all the afore-recited tract of land, etc., rivers, waters, lakes, ponds, brooks, streams, beaches, harbors, fishing, hunting and fowling," etc. The *habendum* clause of this grant was as follows :

" To have and to hold all the afore-recited tract and parcel of land and premises, with their and every of their appurtenances, unto the said Major John Howell  \*  \*  \* (eleven others being named) freeholders and commonalty of the towne of Southampton and their successors forever to and for the several and respective uses following, and to no other use, intent and purpose whatsoever. That is to say, as for and concerning all and singular the severall respective parcells of land and meadow part of the granted premises in any wayes taken up and appropriated before the day of the date hereof unto the several and respective present freeholders and inhabitants of the said town of Southampton by virtue of

the afore-recited deed or patent to the only use, benefit and behoofe of the said respective present freeholders. and inhabitants and to their several and respective heirs and assigns. forever. And as for and concerning all and every such parcell or parcells, tract or tracts of land remainder of the granted premises not yet taken up or appropriated to any particular person or persons by virtue of the afore-recited deed or patent, to the use, benefite and behoofe of such as have been purchasers thereof and their heires and assigns forever in a proportion to their severall and respective purchases thereof made as tenants in common, without any lett, hindrance or molestation to be had or reserved upon pretence of joynt tenancy or survivorship, anything contained herein to the contrary in any ways notwithstanding." It then, with considerable detail, created the inhabitants a body corporate by the name of "The trustees of the Freeholders and commonalty of the town of Southampton" and provided for the government thereof.

The contention of the defendant is that, under the Dongan charter, the title to the undivided and unappropriated land vested in purchasers thereof under the Farrett and Indian deeds as tenants in common, which purchasers are known and described as "proprietors," and it proved a title from certain trustees of said proprietors elected pursuant to chapter 155, Laws of 1818.

Further facts appear in the opinion.

*E. A. Carpenter* and *H. P. Hedges* for appellant. The statute of uses was operative in this colony at the dates of the patents and deeds. (4 Kent's Com. 293, 296, 299; Gerard on Titles, 252; Hilliard's Abridgment, 195; *Fields* v. *Fisher*, 10 Johns. 504; *Jackson* v. *Myers*, 3 id. 88; 9 Wend. 611; Const. of New York of April 20, 1777, art. 35; Id. 1822, art. 7; Id. 1846, art. 7; Id. 1875, art. 7; Documentary History of New York, 755; Revised Laws of New York, 72.) When a patent or grant conveys a tract of land by metes and bounds, the land under water, as well as other land, will pass if the

land under water lies within the bounds of the grant. (*Trustees* v. *Strong*, 60 N. Y. 71–82; *Rogers* v. *Jones*, 1 Wend. 273.)

*James C. Carter* for respondents. The title to most of the lands upon Long Island rests upon grants originally made by the colonial governors, and the trustees of the towns acquired the legal title to all the lands conveyed. (*Rogers* v. *Jones*, 1 Wend. 237; *Trustees* v. *Strong*, 60 N. Y. 56; *Hand* v. *Newton*, 92 id. 88; *Robbins* v. *Ackerly*, 91 id. 98; *Mayor*, *etc.*, v. *Hart*, 95 id. 451; *Roe* v. *Strong*, 107 id. 350, 358; *Trustees* v. *Kirby*, 68 id. 459; *Atkinson* v. *Bowman*, 42 Hun, 404.) The predominating force of a uniform usage, continued through generations, in expounding the titles acquired under ancient deeds or charters, has always been recognized in the law. (*Livingston* v. *Ten Broeck*, 16 Johns. 14; *Hale de jure Maris*, Hargrave's Law Tracts, 33; *Jackson* v. *Wood*, 13 Johns. 347; *Adams* v. *Frothingham*, 3 Mass. 360; *Codman* v. *Winslow*, 10 id. 149; *Bayard* v. *Goodwin*, 2 id. 475; *Atty.-Gen.* v. *Parker*, 3 Atk. 576; *Stewart* v. *Patrick*, 68 N. Y. 450.) By the Dongan charter a use was created in the purchasers of the lands conveyed by it then unappropriated, which use was executed in such purchasers and thus vested the fee in them. (Sheppard's Touchstone, 236; *Thomas* v. *Marchfield*, 10 Pick. 364; *Sackson* v. *Sisson*, 2 Johns. Cas. 321; 3 Washburn on Real Property [4th ed.] 263; 4 Cruise's Dig. 262, 363; 1 id. 354.) No title could ever be acquired to lands in this state through an Indian deed. (*Johnson* v. *McIntosh*, 8 Wheat. 543; *Martin* v. *Waddell*, 16 Pet. 367.)

BROWN, J. Nearly all the Long Island towns were created by royal charters, and the patents were intended not only to create the corporate bodies and thus clothe the inhabitants with the power of government, but also to convey the title to the land within the bounds of town.

In several cases the charters of these towns have been before the courts for construction, and invariably it has been decided that under them the towns, in their corporate char-

acter, took title to the undivided and unappropriated land within their bounds. (*Brookhaven* v. *Strong*, 60 N. Y. 57; *Hand* v. *Newton*, 92 id. 88; *Robins* v. *Ackerly*, 91 id. 98; *People* v. *N. Y. & Manhattan Beach R. R. Co.*, 84 id. 565; *East Hampton* v. *Kirk*, 68 id. 459; *Rogers* v. *Jones*, 1 Wend. 237; *Atkinson* v. *Bowman*, 42 Hun, 404; *North Hempstead* v. *Hempstead*, 2 Wend. 109.)

With one or two exceptions, all the cases cited were either actions for trespass or in ejectment, and involved directly the question as to the title of the towns.

While the precise point that is now made does not appear to have been considered or discussed in the opinions of the court or in the briefs of counsel, the cases show that in some of the charters the language of the *habendum* clauses was similar to that in the Dongan charter of Southampton, and if the defendant's contention is sound, those decisions could not be sustained.

The charter of Easthampton, which was before this court in *Trustees* v. *Kirk*, and before the Supreme Court again in *Atkinson* v. *Bowman*, and the charter of Brookhaven, which was before this court in *Trustees* v. *Strong* and *Hand* v. *Newton*, have *habendum* clauses almost identical with the Dongan charter of Southampton. In all of them it was distinctly decided that the title to the common land was in the towns, and as to the land under water of the navigable bays, rivers and harbors, if there was before any doubt about it, the case of *Trustees* v. *Strong* settled the law, that notwithstanding the public right to navigate such waters, the land under the water could be the subject of exclusive ownership, and in the case then before the court was owned exclusively by the town.

I am unable to perceive any distinction between the cases cited and the one we are now considering. The claim that the original settlers had title under the Farrett and Indian deeds, which was recognized by the English government and confirmed in the royal grants, has no foundation in fact or in law. The case contains no evidence of any title possessed by the Earl of Stirling. Whatever the historical fact may be,

we cannot go outside of the record to find it.   Title must be and always is a matter of proof, and no evidence was given in this case tending to show that the Earl of Stirling had any property right in Long Island.

Nor did the Indians have any title to the land which they could grant, and which would be recognized in the courts of this country.   The English possession in this country rested upon the right of discovery, and the lands were held by the king as the representative of the nation.   This subject has been learnedly discussed by Chief Justice MARSHALL in *John-son v. M'Intosh* (8 Wheat. 543), and by Chief Justice TANEY in *Martin v. Waddell* (16 Peters, 367), and in these cases the Supreme Court of the United States said: " If discovery be made and possession be taken under the authority of an exist-ing government, which is acknowledged by the emigrants, it is supposed to be well settled that the discovery is made for the benefit of the whole nation, and the vacant soil is to be dis-posed of by that organ of the government which has the con-stitutional power to dispose of the national domain.

" The Indian tribes in the new world were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the nation by which any particular portion of the country was first dis-covered.   Whatever forbearance may have been sometimes practiced toward the unfortunate aborigines, either from humanity or policy, yet the territory they occupied was dis-posed of by the governments of Europe at their pleasure, as if it had been found without inhabitants."

The supremacy of the Dutch government was never estab-lished over the eastern end of Long Island; and although there may have been assertion of dominion and title there never was any exercise of sovereign power over the lands in that part of the island, until the final establishment of the power of England through the government and laws promulgated by the Duke of York.   We must look, therefore, for the origin of the title to the land within the plaintiff's town, to the

grant of the Duke of York, and to the royal charters issued under his government.

The first patent of the town was in 1676 by Governor Andross. It recited the existence of a town commonly called and known by the name of Southampton, and granted the lands within the town to JOHN TOPPING, justice of the peace, and fourteen others, for and on behalf of themselves and their associates, the freeholders and inhabitants of said town, their heirs, successors and assigns, " to have and to hold the same to their proper use and behoof forever; " stipulating that said lands should " have relation to the town in general for the well government thereof; " and created said patentees a body corporate under the name of Southampton. There can be no doubt that, under this patent, the title to all the lands vested in the corporate body thereby created. The grant was from the sovereign, who gave the grantees capacity to take and hold in a corporate character, and was made to individuals who might be trustees. It recognized the existence of a civil community occupying the lands granted, having some form of government, and made the officers of that government patentees, and provided that the lands granted should " have relation to the town in general for the well government thereof," and that the quit-rent should be paid, not by the individual patentees, but by the town.

I can see no distinction to be made between this patent and the patents of the towns of Hempstead (2 Wend. 133) or Oyster Bay (1 id. 237).

Under this grant, therefore, title vested in the town. The Dongan charter was granted ten years later. It can hardly be presumed that it could have been intended by that deed to have changed the title to the land. Prior to the date of the Andross charter all the Indian deeds had been delivered and the rights of the Indians extinguished. Under that charter the title had vested absolutely in the town. We have no evidence to show what the exigency was that demanded the Dongan charter, other than the recitals in the instrument itself. These do not show that any person had complained of the

title to the land being in the town, or that the rights of the original proprietors had thereby been prejudiced. After setting out in full the Andross charter, it recites a difference between the Indians and the inhabitants as to the bounds of the town, and that the Andross charter had not conferred all the privileges and immunities of the town which it was understood it should have ; recited a request by order of the freeholders that the government would determine the difference with the Indians, erect the town into one township within the limits and bounds aforesaid, and " confirm unto the freeholders all the above-recited tracts and parcels of land."

Such we must assume to have been its purpose. I cannot presume that it was intended to change or alter the title to the lands, and take it from the corporate town and vest it in individuals. Such an act would have been a clear case of confiscation and entirely beyond the power of the governor of the province. (*Johnson* v. *McIntosh, supra,* 580.)

There is nothing in the instrument to indicate any intention to vest any of the land in individuals, except it be found in the peculiar phraseology of the *habendum* clause.

The grant is to twelve patentees described as " freeholders and inhabitants of Southampton hereinafter erected and made a body corporate, to be called by the name of the trustees of the freeholders and commonalty of the town of Southampton." The patentees are subsequently declared " to be the first trustees of the town to continue in the aforesaid office from and after the date of these presents until the time that others be elected." Under this grant the title to the common lands was confirmed to the town unless the legal effect of the *habendum* clause was to vest it in the individuals as tenants in common.

The defendant contends that by the statute of uses no title under the Dongan charter remained in the town, but that the legal title immediately passed to the individual purchasers under the Indian deed.

Similar clauses to the one under discussion are to be found

in the charters issued by Governor Dongan to the towns of Easthampton and Brookhaven, and if the defendant's claim rests in sound law, it is remarkable that the point escaped the attention of the learned counsel who argued the cases involving those patents and the learned judges who decided them.

By the unanimous opinion of this court it was three times decided in the case of the towns named, that the title to the common land was in the town. (*Brookhaven* v. *Strong; Trustees* v. *Kirk; Hand* v. *Newton, supra.*)

We do not think, however, that it is necessary to examine the effect upon this charter of the statute of uses.

It may be, if the grant was a recent one, between individuals, by which title passed from the vendor to the vendee, that, as a matter of strict technical law, the point is sound. We express no opinion on the question. This grant is to be tried by other standards, and interpreted in the light of other considerations.

As I have already pointed out, the title had vested in the town under the Andross patent. No one ever had denied the equitable rights of the original proprietors in the upland, as no one appears ever to have denied it since that charter. It was recognized by the inhabitants before the charter was granted, and by the trustees of the town after the Dongan patent, and subsequently by the legislature of the state.

It may be that some question had arisen concerning the proprietors' rights, after the Andross and before the Dongan charter, and some acknowledgment thereof from the ruling power was deemed proper.

If there was any claim of a tenancy in common under the Indian deeds, the number of owners must have increased largely before the date of the Dongan patent. Proper control and management of the lands forty-six years after the original purchase would probably have been a difficult matter on account of the numerous owners and the difficulty of ascertaining who such owners were.

As an acknowledgment of the rights of the original purchasers and those who had succeeded them, the *habendum*

clause of the Dongan patent is explainable. The legal title was to be in the town; the rights of the proprietors were recognized, but were regarded as purely equitable.

Whether this construction of the legal effect of the patent. is correct or not, it was the one adopted by all parties in interest, and acted upon by the town and the proprietors or purchasers of the Indian rights. In the construction of a public charter granted for the purpose of creating a civil community, the practical interpretation it has received from those interested therein, and acquiescence in such interpretation for a long series of years is the most important evidence in the determination of rights existing thereunder, and the strict letter of the instrument becomes of comparatively little importance.

The fact that stands out prominently upon the record, in reading it upon this question, is that no one ever claimed title to any of the land within the town as tenant in common, as that term is ordinarily understood. No individual ever took title to any of the lands directly under the patent. There is not an instance cited in the very voluminous record before us in which the proprietors or purchasers managed or disposed of any of the land as tenants in common.

And it may be here stated that the defendant's title is wholly inconsistent with any such thing. The foundation of that title is a deed from certain trustees representing and elected by a majority vote of the proprietors, under chapter 155 of Laws of 1818. Nothing can be plainer than that an act of the legislature, which purports to give to trustees, elected by a majority vote of tenants in common in land, the power to sell and pass the title to such land, would be absolutely void.

If the argument, on the part of the appellant, is sound, it has demonstrated beyond question that it has no title whatever to the land it claims, unless it can show one gained by adverse possession, and from the character of the property involved that would probably be a difficult matter.

Turning again to the construction of this patent adopted and acted upon by the parties in interest, we find that the

management and disposition of the lands, until division and allotment thereof, was always by the town in town meeting or by the trustees.

As the town increased in inhabitants, tracts of the common land were, from time to time, allotted by the town trustees among the proprietors, according to their respective interests, and these allotments are the source of nearly all the private titles within the town. Until this allotment their control by the trustees was unrestricted, except occasionally by the town meetings.

Instances are cited where the trustees disposed of the land absolutely. Grants were made to induce the settlement of mechanics and others in the town, but in no case was it ever assumed that the legal title was elsewhere than in the town, and all deeds were executed by the trustees.

All this as to the uplands. As to the lands under water none were ever allotted or sold or made the subject of individual ownership. The absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time.

They leased the fisheries to particular persons, generally on condition that the fish be sold only to the inhabitants of the town. They prohibited the taking of fish, clams and oysters during certain periods of the year and enforced such prohibition by penalties.

They leased the land under water for oyster planting, and agreed to indemnify and defend the lessees against assertion of hostile rights in the leased property.

They sold the seaweed from the beaches, gave consent to the erection of wharves and docks, and regulated the use thereof. Provided for the building of mills on the streams, and in numerous instances passed and enforced ordinances regulating the fishing and oystering in the bay, which is the subject of this suit.

Such was the usage under the patents down to the year 1818. The town held undisputed possession of the unallotted lands and of the water within the town, and claimed and

assumed to hold the legal title.   The equitable rights of the proprietors were recognized by frequent divisions among them of the income received from the lands and by frequent allotments of lands among them.   In the year 1818, the legislature enacted a law which authorized the proprietors by a majority vote to elect from their number, trustees with such power to manage all the undivided lands of the town " as the trustees of the freeholders and commonalty of the town of Southampton now have," and empowered such trustees to sell, lease or partition the same, but especially reserved to the town trustees the management of the waters, fishing, seaweed and production of the waters " for the benefit of said town as they had power to do before the passing of this act."

Since the enactment of this law the common lands have been managed by the trustees elected by the proprietors, and the waters and their product have been managed by the town. As I have already pointed out, if the title to the lands was held by the proprietors as tenants in common, this law could not be sustained as a valid exercise of legislative power, but otherwise if the title was in the town.   (*Philadelphia* v. *Fox*, 64 Pa. St. 180 ; *Girard* v. *Philadelphia*, 7 Wall. 1 ; *Montpelier* v. *East Montpelier*, 29 Vt. 12 ; *North Yarmouth* v. *Skillings*, 45 Me.  133 ; *People* v. *Morris*, 13 Wend. 325 ; *Darlington* v. *Mayor*, etc., 31 N. Y. 164.)

It is very likely that at this time some controversy existed as to the rights of the inhabitants of the town under the grants, and that this law was the result of a compromise.

We find a record of a special town meeting held February 17, 1818, at which it was voted "that there shall be some alteration made respecting the privileges of said town," and " that the bill brought forward now and which has been read to the house be the form of a law," and " that there be two committees, one on the part of the town, the other on the part of the proprietors."

"A committee on the part of the town was then appointed."

Alterations in the privileges of the town could only be made by the legislature, and the appointment of committees to

represent the conflicting interests existing in the town upon the subject of these lands would have been in accordance with modern notions in respect to obtaining necessary legislation from the law-making power. The act was passed on April 13, 1818, and if it was the result of a compromise, its validity could not be questioned. However this may be, there is no doubt that it was acquiesced in, and from such acquiescence it will be deemed to have been passed by consent of the interested parties. (*Congregational Society* v. *Curtis*, 22 Pick. 320; *Humphrey* v. *Whitney*, 3 id. 164; *Rogers* v. *Goodwin*, 2 Mass. 475.)

In the year 1831 the legislature enacted another law (chap. 283, Laws of 1831), in which it was provided that the trustees (of the town) should have the "sole control" and management of the fisheries, seaweed, waters and productions of the waters of the town granted by the Dongan charter, except so far as they had been changed and altered by the act of 1818.

Of this act there is clear evidence to show that it was passed at the request of the inhabitants of the town. At the annual town meeting held in April, 1831, for the election of trustees, it was voted as follows: "In consequence of an application to the legislature at their thirty-fourth session, in the winter of 1831, for a law in regard to the powers and duties of the trustees, *about which there began to be so many conflicting opinions as construed from the charter of Governor Dongan,* it is thought advisable for the trustees not to meet till they could meet and act under the new law."

The law having been passed, the trustees met on August thirtieth, and the act was transcribed in full on the trustees' book.

We have, then, not only an uninterrupted user, under the patents, by the town and its inhabitants for over two centuries recognizing the right of the town to control and manage the waters of the town and their productions, and to exercise over them all the rights which flow from ownership and possession of title, but the distinct recognition by the legislature of the state on two occasions that the title thereto was in the town.

In the face of such evidence, the assertion that the proprietors are, or ever claimed to be, tenants in common of the lands or waters of the town can find no foothold in the case.

I can find no instance, until the origin of the present claim to Mecox bay, of any claim to individual ownership. If I have overlooked any evidence of such as to the uplands, it may be confidently asserted that none can be found as to the lands under the water. As to that species of property, the inhabitants of the town appear to have maintained inviolate the agreement of the original undertakers, made at the very inception of the enterprise, as follows: "Furthermore, no person nor persons whatsoever shall challenge or claim any proper interest in seas, rivers, creeks or brooks howsoever bounding or passing through his grounds, but freedom of fishing, fowling and navigation shall be common to all within the banks of the said waters whatsoever."

The practical construction that is thus shown to have been put upon these grants must, we think, control the decision of this case.

In speaking of this class of evidence, Chief Justice Church, in *Brookhaven* v. *Strong*, says: "These elements of title are very much strengthened by possession and user during the long period which has lapsed. * * * The defendant put in some evidence to show that the right had been disputed and resisted from time to time. Without referring to it in detail, it can only be claimed to establish that dissatisfaction was evinced. * * * It is not necessary, in order to claim the benefit of user, that every person in the community should acknowledge the right. It may be disputed or denied, but this is of no moment, provided the claimants vindicate their rights when an effort is made to dislodge them. * * *

"This long user and occupancy, though probably not a technical bar under the statute of limitations, on account of the nature of the property, * * * is sufficient to give the plaintiff the benefit of any presumption which may be legitimately indulged to supply defects, if not a title by prescription." (2 Greenl. on Ev. 178; *Vandyck* v. *Van Beuren*,

1 Caines, 83; *Jackson* v. *M'Call*, 10 Johns. 377; *Ricard* v. *Williams*, 7 Wheat. 59; *Livingston* v. *Ten Broeck*, 16 Johns. 14; *Atty. Gen.* v. *Parker*, 3 Atk. 577.)

In this case there is no dispute as to the uninterrupted user by the town under these patents for two hundred years, and, in the face of such user, it would be idle to discuss the technical or literal meaning of the language of the charter. The parties interested have settled that beyond recall. Even though it be susceptible of the meaning claimed for it by the appellant, the strict letter of the instrument must now give way to the practical construction adopted and acted upon by the inhabitants of the town. Upon such construction all the private titles to lands within the town rest, and, as has been appropriately said in the brief of the learned counsel for the respondent : " Courts should not undertake to reverse the action and traditions of centuries, and change titles which have become vested under contrary views."

We think the judgment of the lower courts was correct, and should be affirmed, with costs.

HAIGHT, J. I fully concur in the views expressed by Judge BROWN. Perhaps the most serious question to be considered arises upon the construction of that portion of the *habendum* clause in the Dongan charter which provides that " as for and concerning all and every such parcel or parcels, tract or tracts of land remainder of the granted premises not taken up or appropriated to any particular person or persons by virtue of the afore-recited deed or patent to the use, benefit and behoof of such as have been purchasers thereof, and their heirs and assigns forever, in proportion to their several and respective purchases thereof, made as tenants in common," etc.

In construing this provision we must take into consideration that which precedes and follows, in order that we may arrive at the purpose and intent of the grantor. The granting clause of the charter was to the freeholders and inhabitants of Southampton, who were made a body corporate and politic, called by the name of the Trustees of the Freeholders and

Commonalty of the town of Southampton, and their successors. The first provision of the *habendum* clause confirmed the title to those who had taken up and appropriated land by virtue of an afore-recited deed or patent, unto their several and respective heirs and assigns forever. The subsequent provisions of the charter constituted the freeholders and inhabitants of the town of Southampton a body corporate and politic, in deed and name, and declared that they have succession forever, and that they " shall be forever in future times persons able and capable in law to have, perceive, receive and possess, not only all and singular the premises, but other messuages, lands, tenements, privileges, jurisdictions, franchises and hereditaments of whatsoever kind or specie they shall be, to them and their successors in fee forever." It further provided that they shall, as such, " give, grant, release, alien, assign and dispose of lands, tenements, hereditaments and all and every other act and acts, thing and things, to do and execute by the name aforesaid."

It will thus be observed that a corporation was created for and on behalf of the township, that the land was granted to the corporation. So far as those who had, prior to that time, taken up and appropriated land, under a former patent, their title and right thereto was confirmed. As to that which had not been taken up or appropriated by any person, it was held for the benefit of such as had been purchasers thereof, and their assigns, in proportion to their several purchases thereof made as tenants in common. If it was by this provision intended to make the inhabitants, who had taken up and were then owners of land, tenants in common of that which had not been taken up, then the title vested in them as tenants in common and they could convey. But if this clause is to be given this interpretation, what becomes of the subsequent clauses in which the corporation is given the power to grant and convey? Surely it was not intended that the corporation should grant and convey that which had already been taken up by persons whose titles had been confirmed by the provisions

of this charter.   The power to grant and convey by the corporation must, of necessity, be limited to those lands which had not, as yet, been taken up.   So that we have not only the granting clause vesting the title in the corporation, but we have the concluding clause giving the corporation power to grant and convey, which would be in direct conflict with the interpretation that the inhabitants took as tenants in common.   We must, therefore, see if such construction was, in fact, intended.

It will be observed that it does not provide that the inhabitants shall take that which remains of a tract of land not taken up as tenants in common, but does, in substance, provide that the parcels of land remaining not taken up or appropriated, shall be held " to the use, benefit and behoof of such as have been purchasers thereof, and their heirs and assigns forever." It then provides that it shall be in proportion to their several and respective purchases thereof, made as tenants in common.   It was their former purchases that were made as tenants in common.   This is consistent with their former history, for, when their settlement was originally made, a community was organized, consisting of forty, to each of whom was assigned a part, the whole being held in commonalty. Whilst their past relation was recognized, the governor, in delivering to them a new charter, did not see fit to vest in them the title as tenants in common, but, instead, placed it in the corporation created by him.   Whether or not he intended that they should share in the proceeds of the sales, as tenants in common, in proportion to their purchases, it is not necessary for us to now determine.   But his intent and purpose to vest the title in the corporation and give it the power to sell and convey is quite apparent.   At that time the community had increased in numbers and the unoccupied lands were required by new comers.   The obstacles in the way of obtaining a deed from several hundred tenants in common were such as to make it necessary that the title should be so vested that it could readily be conveyed.

All concur.

Judgment affirmed.