JOHN W. NANCE, Respondent, *v.* TOWN OF OYSTER BAY et al., Defendants, and UNITED STATES DREDGING CORPORATION et al., Appellants.

Second Department, March 29, 1965.

10

*Foley & Martin* and *Hall & Casey* (*William M. Smith, George A. Dean* and *Jerome H. Doran* of counsel), for United States Dredging Corporation, appellant.

*Charles T. Matthews* for Town of Huntington and another, appellants.

*Henry W. Schober* for respondent.

CHRIST, J. The ultimate question for determination on this appeal concerns the title to underwater land at the southern end of Cold Spring Harbor, in the area known as the inner harbor. Cold Spring Harbor is a navigable body of water which extends southerly from Long Island Sound for about five miles into northern Long Island. The upland to the west lies in the defendant Town of Oyster Bay, Nassau County, and the upland to the east lies in the defendant Town of Huntington, Suffolk County. The inner harbor is the area south of a sand bar which runs from the Oyster Bay upland easterly across the greater part of the width of the harbor.

The specific controversy presented for determination may be briefly summarized: (1) whether either town (or the Board of Trustees of the Town of Huntington [see L. 1952, ch. 816; L. 1962, ch. 865]) owns any underwater land in the inner harbor; (2) if it be established that both towns own such underwater land, whether there is a common title boundary line which divides their respective underwater lands; and (3) if such boundary line be found to exist, what is the correct delineation of that line.

The judgment which we are reviewing is interlocutory; it is confined to the determination of the substantive legal issues presented as to liability. The trial and the determination of the remaining issues relating primarily to damages were reserved for a future date.

Under contracts between the Town of Huntington and the defendant United States Dredging Corporation (hereafter referred to as Dredging), the latter was engaged to do dredging work. The last of these contracts, made in 1954, authorized Dredging to do such work in the inner harbor, with exceptions not presently relevant. In accordance with the terms of the contract, from about April, 1955 through June, 1959, Dredging extracted sand and gravel from the bed of the inner harbor. In 1959 the Town of Oyster Bay also entered into a contract with Dredging for such work, also to be done in the inner harbor; but no work was done under that contract and it was subsequently cancelled.

In October, 1959, plaintiff, as a taxpayer of Oyster Bay, instituted the present action under section 51 of the General Municipal Law. In his amended complaint the plaintiff charges that Dredging has taken materials from portions of the inner harbor which are owned by Oyster Bay. Plaintiff seeks an injunction against Dredging's further dredging operations in the inner harbor; the recovery of damages on behalf of Oyster Bay from Dredging and the Board of Trustees of Huntington for the taking of such materials; and a declaration that the contract between Oyster Bay and Dredging is illegal and void.

Several months after all the defendants had served their answers to the amended complaint, Dredging made two payments to Oyster Bay, totaling $31,449.29, on the strength of certain calculations which had been made with respect to part of the material taken by Dredging from the inner harbor. No application to amend any of the answers so as to plead such payments as a defense of settlement was made until the end of plaintiff's case, when Dredging moved to amend its answer to allege such a defense. The motion was denied.

Land titles and political boundaries of "nearly all the Long Island towns were created by royal charters" or patents; such grants by the English rulers "rested upon the right of discovery;" and titles based purely on grants from the Indians were not cognizable in law (*Trustees, etc. of Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1, 5–8). However, the territorial descriptions in "The early grants to the two towns [Oyster Bay and Huntington] were ambiguous"; and since "the earliest colonial days" these towns have disputed the boundary line which divides them. But wherever the line truly lies, it is the same one that divides the counties of Nassau and Suffolk (*Matter of Jennings* v. *Watt*, 264 N. Y. 306, 310–311, 313).

Three different lines have variously been thought to be the title boundary line as to lands of the two towns in this area:

One line was set forth in the application which was made in 1954 to the Department of the Army, Corps of Engineers, for a permit for the very dredging involved in this case; and that same line also appears in a 1914 Belcher-Hyde Atlas which was included in the application. That line runs from the head or southern end of Cold Spring Harbor, northerly through about the middle of the inner harbor. It is undisputed that such line is not the correct one and that reliance upon it in the application for the permit was misplaced.

A second line is one which was determined by the State Engineer and Surveyor in 1860 and again in 1875. In connection with the 1875 determination, that official had before him a survey which had been made in 1873 by Messrs. Shipman and Whitney, who had been engaged by two respective Commissioners of the Counties of Suffolk and Queens to make the survey. What is now Nassau County was, until 1899, a part of Queens County (L. 1898, ch. 588). Both the 1860 and 1875 determinations of the State Engineer and Surveyor were in accordance with the line laid out in the Shipman-Whitney survey. The 1875 determination was made partly in reliance on a written agreement of the two County Commissioners that the survey line was " a just and equitable line."

The Shipman-Whitney survey was filed in 1875 in a State office which is now the Office of General Services. Reproductions of the survey were filed in 1878 in what is now the office of the New York City Register in Queens County; one was received by the Clerk of the County of Nassau when that county was created; and one has been kept in the office of the Historian of the Town of Huntington.

In addition, this second boundary line as determined in 1860 and 1875 by the State Engineer and Surveyor is set forth as the boundary line in another map which was made in 1959 by Sidney B. Bowne & Co. at the request of the Town Supervisor of Oyster Bay in connection with the subject matter of this action. This line has also been recognized by the Legislature as the dividing line between the Towns of Oyster Bay and Huntington (L. 1860, ch. 530; L. 1872, ch. 105; L. 1886, ch. 667).

The " settlement " payments which Dredging made to Oyster Bay were premised on this second boundary line as being the correct one. This line, which runs somewhat to the east of the first-mentioned boundary line, was approved in *Matter of Jennings* v. *Watt* (264 N. Y. 306, *supra*) and is hereafter sometimes referred to as " the *Jennings* line."

The third boundary line is the high-water mark on the easterly side of the harbor. This line was approved in *Tiffany* v. *Town*

*of Oyster Bay* (209 N. Y. 1) and is hereafter sometimes referred to as " the *Tiffany* line."

Neither the plaintiff nor Huntington nor Dredging has been constant with respect to the matter of the location of a title line. In his amended complaint plaintiff took the position that the true line is the *Jennings* line — the same position which, prior to the commencement of the action, he had pressed in a letter to the two towns and to Dredging. He wanted Oyster Bay to be paid for materials taken from west of the *Jennings* line. He continued to maintain that position up to and throughout the trial; in his opposition to a motion for summary judgment, and on the appeal to this court from the order denying that motion (*Nance v. Town of Oyster Bay,* 13 A D 2d 1014). The trial court, however, chose the *Tiffany* line, which is much more favorable to plaintiff (and to Oyster Bay) than the one he had endeavored to establish, and held that Dredging is liable in trespass to Oyster Bay for all the materials it took from the bed of the inner harbor. Plaintiff now willingly accepts the *Tiffany* line and the unanticipated abundance which it would yield for Oyster Bay.

On the motion for summary judgment and on the appeal from the order denying that motion, Huntington had urged the *Jennings* line, but at the trial it enlarged its claim so as to exclude Oyster Bay from title to any of the underwater land. On this appeal it further contends that title to all the underwater land in dispute is vested in the Board of Trustees of the Town of Huntington. In support of this claim, it urges that the royal patent which was granted to Oyster Bay did not give that town title to any common lands and that the *Jennings* line established only a jurisdictional or political boundary between the two towns.

Dredging, in its answer to the amended complaint, indicated that the true title line is the *Jennings* line, and that its " settlement " payment to Oyster Bay was premised on that line as controlling. Nevertheless, at the trial Dredging contended that Oyster Bay had been divested long ago of its title to any of the underwater land.

It is our opinion that both towns own underwater land in the inner harbor on the respective sides of a single line, which governs both as to title and as to jurisdiction of the towns; and that that line is the *Jennings* line. Huntington acquired its title under three royal patents, granted successively by Governors Nicolls, Dongan and Fletcher, and respectively dated November 30, 1666, August 2, 1688 and October 5, 1694. Oyster Bay acquired its title by the patent, dated September 29, 1677, granted by Governor Andros. The power of the Governors to issue these patents lay in the grant, dated March 16, 1664, by Charles

II to his brother, the Duke of York, of a vast territory which included all of Long Island; the Governors acted as agents of the Duke's government (see *Trustees etc. of Town of Southampton* v. *Mecox Bay Oyster Co.*, 116 N. Y. 1, *supra*).

The Nicolls patent expressly acknowledged that Huntington was a town and that several of its freeholders and inhabitants had purchased land in that town. This patent stated that all the lands which had been and which thereafter would be purchased for Huntington within the boundaries set forth in the patent were thereby ratified, confirmed and granted to named persons as patentees and to all other of the town's freeholders and inhabitants. The patent also granted to the "Patentees and their Associates * * * all the priviledges belonging to a Towne." The westerly boundary of the described territory was stated to be: "from a Certaine River or Creeke on the west comonly called by the Indyans by the Name of Nackaquatack and by the English the Coldspring." The instrument added the following to the grant: "also all Havens Harbours Creekes Quarryes Woodland Meadowes Pastures Marshes Waters Lakes ffishing * * * And all other Proffitts Commodityes Emolumts and Hereditamts to the said Land and Premisses within the Limitts and Bounds aforementioned described belonging or in any wise appertaining."

The Andros patent, like the Nicolls patent, acknowledged the existence of the benefited town; but, of course, in the Andros patent the town was Oyster Bay. The Andros patent also acknowledged that the town, Oyster Bay, owned certain territory described in the patent; and, again as in the Nicolls patent, it contained: (1) a ratification, confirmation and grant of the territory to named persons as patentees and to all other of the town's freeholders and inhabitants; and (2) a confirmation and grant to the patentees and their associates of "all the Privelledges & immunitys belonging to a Township."

In the Andros patent the description of the territory began with the setting out of the eastern boundary, as follows: "The East bounds whereof begin att the head of the COLD SPRING and so to range upon the Southward line from the SOUND or NORTH SEA to the SOUTH SEA cross the Island". The description did not end at the stated beginning point, i.e., "the head of the COLD SPRING," but rather at what would be the easterly boundary as extended northerly from that point. A supplemental or alternative description was also added so as to define the territory in much briefer form, namely: "Bounded on the North by the Sound, on the East by Huntington Limmits".

In further similarity to the Nicolls patent, the Andros patent included a grant as to waterways and other areas, which is described generally by their nature, as follows: "Together with all the Woodland, * * * water, Lakes, Rivers * * * and all other * * * Emoluments & Hereditaments to the said Towne Tract of Land and premises within the Limmitts & bounds aforemenconed described, belonging or in any way appertaining." Finally, the Andros patent also contained the following: "provided alwaies notwithstanding that ye extent of ye Bounds before recited do no way prejudice or infringe the particular Propriety of any person or persons who have right by patent or other Lawful Claime to any part or parcel, of Land or Tenements within the Limmitts aforesaid."

The later Dongan and Fletcher patents were separate confirmations of the Nicolls patent, including the descriptions as to the land and the tacked-on concomitants, with the following exceptions: The Fletcher patent changed the boundary at the east (which has no present relevance); each of these two patents made some substitutions as to the names of freeholders-inhabitants which were set out (apparently there were successions of persons with the passage of time); and each of these patents contained similar pronouncements that the freeholders-inhabitants of Huntington were thereby constituted a public corporation, to be known as the Trustees of the Freeholders and Commonalty of the Town of Huntington. [In 1872 the offices referred to by that corporate name were abolished and replaced by the then created "board of trustees of the town of Huntington" (L. 1872, ch. 492).]

It is undisputed that the Cold Spring referred to in the patents to Huntington as the westerly boundary of Huntington, and in the patent to Oyster Bay as the easterly boundary of Oyster Bay, begins at the southerly end of Cold Spring Harbor, the body of water which is involved in this case.

With respect to the nature and the scope of the estates conveyed, the land grants in all these patents were no different than those in the patents referred to in the *Southampton* case (116 N. Y. 1, *supra*). In that case it was held that the grants gave to the respective towns title to the common land within their bounds, including the land under water. The decision in *Knapp* v. *Fasbender* (1 N Y 2d 212) confirmed such holding, adding that the titles granted to the towns were to be held by them as common lands for the benefit of the inhabitants of their communities, and indicating by appropriate citation (pp. 222, 231) that this did not depend on whether the patent also transformed the town into a corporation.

As a matter of fact, *Southampton* (116 N. Y. 1, *supra*) dealt with underwater land in Mecox Bay; and in adjudging that the basic patent (by Andros) gave the title to the town, the court noted that the very Andros patent to Oyster Bay which is involved in the instant case was indistinguishable from the patent involved in the *Southampton* case, and the court cited *Rogers* v. *Jones* (1 Wend. 237) which had involved the Andros-Oyster Bay patent. In *Rogers* v. *Jones* (*supra*) it was squarely held that the Andros-Oyster Bay patent gave Oyster Bay title to underwater land in the very Cold Spring Harbor which is involved in the instant action. As already indicated, this was also the holding in *Tiffany* (209 N. Y. 1, *supra*) and in *Jennings* (264 N. Y. 306, *supra*).

This discussion leads to the conclusion that Oyster Bay has title to underwater land in Cold Spring Harbor. Huntington seeks to avoid this conclusion on the strength of certain historical matter concerning the nature of the original titles in Long Island. It contends that the historical materials show, contrary to the nature of the patents to towns in Suffolk County, that the patent to Oyster Bay did not give such town title to any common lands; and that the decisions in *Rogers* and *Tiffany* (*supra*) were in error on this subject because in those cases the parties had failed to bring this historical data to the attention of the courts.

Huntington adduced evidence as to some such historical matter; and in its brief on this appeal it also urges other historical facts of which we take judicial notice. These facts are: (1) that the English settlers in the eastern part of Long Island established towns in which some land was retained by the towns for community purposes; (2) that, in contrast to the English, the Dutch who settled along the Hudson River and around the New York harbor did not establish towns but held all their lands in private ownership under a feudal system; and (3) that the area about the Cold Spring, described as lying between the respective settlements of the English and the Dutch, was settled by heterogeneous migrants from New England. Huntington contends that the land in this area was known as " the old purchase " and was divided among the people in private ownership, that is, " amongst the proprietors;" and that whatever common lands existed in such area were owned, not by a political subdivision of the Government, but privately by these proprietors, in common and among themselves.

Relying upon other proofs, Huntington contends it has established that over the years it has exercised open and notorious

dominion over this and other areas, while Oyster Bay has not done so with respect to any areas. As to Huntington, these proofs show: (1) that Huntington litigated a title dispute with one Richbell as to land in Lloyd's Neck beginning about the middle of the 17th century — a dispute which was not finally determined until 1734; (2) that in 1694 and 1818 Huntington acquired deeds from two other towns in settlement of boundary disputes; (3) that in 1885 it sold the land covered in one of those deeds; (4) that specifically as to the Cold Spring area, Huntington in 1805 and 1827 granted two leases to individuals for dock purposes on the east side of the harbor; (5) that in 1680, 1688 and 1792 it granted premits for mills at Cold Spring; and (6) that it annually sold thatch which grew in the harbor. As to Oyster Bay, these proofs show: (1) three royal patents in 1666, 1677 and 1708, respectively, to named individuals covering other areas in Oyster Bay; (2) a purchase by a group of "proprietors" of other areas in Oyster Bay; and (3) the 1677 Andros-Oyster Bay patent itself.

Huntington urges that the Andros patent to Oyster Bay is distinguishable from the patents to Huntington in that, in the former, the patentees were named individuals and the town was not transformed into a corporate body, whereas in the Nicolls patent to Huntington, proprietary control of the common lands was vested in a board of trustees (referred to in the patent as "patentees"); and whereas in the Dongan and Fletcher patents, Huntington was made into a corporate body.

We have already noted our agreement with the implied holding in *Knapp* v. *Fasbender* (1 N Y 2d 212, *supra*) that the matter of incorporation of the Town of Huntington was irrelevant to the present title question. The determining factor is that the Andros-Oyster Bay patent was intended to give to the town beneficial title to the common lands which it described. The grant under this patent was not less than was intended under the first patent to Huntington — the Nicolls patent — which contained nothing about incorporation.

The historical matter concerning the nature of the original titles to land in the area at or about Cold Spring Harbor is interesting, but it does not establish that the land in the bed of Cold Spring Harbor involved in this action was ever owned privately. Nor does such historical data show that the Nicolls and Andros patents failed to quiet the claim of private ownership of that land founded on events and transactions antedating those patents. Historical matter such as Huntington relies on to exclude Oyster Bay from title rights in the bed of Cold Spring

Harbor was also reviewed in *Jennings* v. *Watt* (264 N. Y. 306, *supra*), but it did not persuade the court there that Oyster Bay does not have title to underwater land in the harbor. As a matter of fact, Oyster Bay asserted title to Cold Spring Harbor; and that assertion led to the *Tiffany* litigation.

We therefore hold that Oyster Bay has title to underwater land in the harbor; and we now consider the *extent* of its ownership. In reviewing the generic boundary line, we find that none of the three patents to Huntington nor the patent to Oyster Bay shows a precise boundary line running through or by Cold Spring Harbor. They all do show, however, a clear common boundary between the two towns, running south from the southerly end of the harbor, namely, the Cold Spring. The patents to Huntington do not delineate precisely the boundary for Huntington going north from the Cold Spring. Nevertheless, wherever such boundary would be, the patent to Oyster Bay unmistakably employs that part of Huntington's boundary as the boundary for Oyster Bay, by the words "bounded * * * on the East by Huntington Limmitts."

The language in the Huntington patents to the effect that the grants to that town included "all Havens Harbours * * * Waters * * * And all other * * * Hereditamts to the said Land and Premisses within the Limitts and bounds aforementioned described belonging or in any wise appertaining" does not aid us. It may be said that Cold Spring Harbor in its entirety is a waterway that appertains to the land otherwise within the grants to Huntington and that, therefore, all of Cold Spring Harbor falls within the provision just quoted. On the other hand, a similar provision in the patent to Oyster Bay, although it omits "Harbours," militates against such construction, since the application of the same reasoning to the Oyster Bay patent would put the harbor within Oyster Bay. Moreover, in all the patents (e.g., the Nicolls patent) the additional qualifying words: "within the Limitts and bounds aforementioned described," might have reference only to waterways that are inside the boundary theretofore referred to in the patents. Yet, the words immediately following, namely: "belonging or in any wise appertaining," could well include abutting waterways.

The final proviso in the patent to Oyster Bay, namely, the saving provision as to property already owned by "any person or persons," is of no consequence in this action. That provision does not fix rights between the two towns, but expresses only an intention to secure the rights of persons who owned land on the Oyster Bay side anywhere along the common line between the

towns. It has not been established that anyone had title to land so situated, particularly to an area within Cold Spring Harbor. In any event, this would not affect Huntington's line.

If applicable, an old principle of law would put Huntington's boundary line at the high-water mark on the easterly shore of the harbor. The principle, defined in *Matter of Mayor, etc., of City of New York* (182 N. Y. 361, 365–369) is that the king "will not be presumed to have [conveyed title to the tideway in navigable waters] by merely bounding the conveyance upon the sea or the river;" that such a conveyance by the king "will carry title only to high-water mark" and that, to overcome such limitation "[o]ther words must be employed in the conveyance which would clearly indicate his [the king's] purpose and intent to convey the lands under water". If that principle could be invoked here in order to put Huntington's boundary line at the high-water mark, it might indeed follow that Oyster Bay was granted all the underwater land in the harbor, since its patent bounded its land "on the East by Huntington Limmitts." However, in *Matter of Mayor* (*supra*) it was indicated that, where the grantee is a local government which is subordinate to the royal grantor, certain matter in the grant might sufficiently constitute such "other words" so as to preclude the application of the old principle, even though the same matter would be insufficient had the grantee been a private person. And, under the rationale of the same case, it might also be said that the grant of "Havens Harbours * * * Waters" in the patents to Huntington was likewise sufficient to prevent the application of the general principle stated. Thus, any attempt to apply this ancient principle could lead only to a perplexing but avoidable basis for a decision. Hence, the principle should not be utilized in aid of the solution of the problem here.

A combination of factors determines the issues in suit. First are the 1860 and 1875 determinations made by the State Engineer and Surveyor. The Revised Statutes (Rev. Stat. of N. Y., part I, ch. VIII, tit. VI, §§ 5, 6) authorized that official to make determinations upon disputes "represented" to him "respecting the bounds" of two or more towns, and provided that: "Such determination shall be filed in the office of the secretary of state, and shall be conclusive upon the subject, until the legislature shall, by law, otherwise direct." Both determinations here were made upon submissions on behalf of Oyster Bay and Huntington. The earlier submission was with respect to the entire boundary line between the two towns; the later submission was with respect to such portion of that line which lies between the head of Cold Spring Harbor and Long Island Sound, thus

including the area involved in this action. Both determinations were filed as required by the statute.

As stated earlier in this opinion, these two determinations established the boundary line in the harbor as such line was laid out in the Shipman-Whitney survey of 1873 and in the subsequent filed reproductions of such survey. Further, in the proceeding which resulted in the 1875 determination the representatives of the two towns actually agreed in writing to that line as "a just and equitable line." That agreement was one of the bases for the 1875 determination and both determinations were recognized by the Legislature. True, at the foot of each determination was a legend that the line thereby established was not to affect the title or possession of any persons along that line, and that it was "for the purpose of Jurisdiction only".

Dredging contends that a certain 1872 resolution of the Board of Supervisors of Suffolk County with respect to this boundary dispute indicates that *title* was involved in the 1875 determination of the State Engineer and Surveyor, and not merely jurisdiction, since part of the then controversy concerned the right to take clams and oysters from Cold Spring Harbor. That resolution is not contained in the record on appeal in the instant case, but it was part of the record in *Matter of Jennings* v. *Watt* (264 N. Y. 306, *supra*).

Huntington argues, however, that the said legend at the foot of each determination of the State Engineer and Surveyor showed that the titles of the towns were not in issue; and that this legend was a saving proviso in recognition of early legislation to the effect that boundaries of counties and towns which were then being laid out shall not be deemed to affect private or public titles (L. 1788, ch. 63, ch. 64; Rev. Stat. of N. Y., part I, ch. II [tit. I, § 4; tit. IV, § 57]), and in recognition of the due process clause of the State Constitution (art. I, § 6). Huntington further argues that the State Engineer and Surveyor had no authority to determine a title line, and that, insofar as *Jennings* (264 N. Y. 306, *supra*) might indicate that the 1860 determination established a title line, it was obiter dictum.

We are of opinion that the State Engineer and Surveyor was concerned only with establishing the jurisdictional line. As stated in *Jennings* (*supra*, p. 311), the submission of the dispute that led to the 1860 determination was "to locate the jurisdictional boundary between the two towns." However, this stated reason for the submission does not destroy the usefulness here of the determination. We have already demonstrated above that the royal grants established a single line only, intending such line to stand for both title *and* jurisdiction. It was that line

which was twice factually established by the State Engineer and Surveyor. Whatever the reason for invoking his authority, there can be no proper reason to deny the binding effect or the validity of his factual determination. We believe that this view is supported by *Jennings* (*supra*) and that *Jennings* also laid to rest whatever was said in *Tiffany* (209 N. Y. 1, *supra*) to the effect that the title line is along the high-water mark on the easterly shore of the harbor.

In *Tiffany* (*supra*) the plaintiff owned upland on the west shore of the harbor, but north of the inner harbor. Having obtained a grant from the State of the underwater land fronting on his upland, plaintiff erected structures between the high and the low-water marks on this State-granted land. The Town of Oyster Bay, claiming title to this underwater land under its Andros patent, demolished the structures in part. Plaintiff sued for an injunction. The court upheld the town's title claim, stating that the town's title under that patent was determinable partly by Huntington's westerly title line under the Nicolls patent, and that such westerly title line was the high-water mark on the east shore of the harbor.

That judicial declaration in *Tiffany* (*supra*) as to the location of the title line was more than the decision of the case required; and it was thereafter repudiated in *Jennings* (*supra*) on sound reasoning.

*Jennings* was a certiorari proceeding to review the refusal of the Town Board of Huntington to consent to the annexation of certain territory to the Village of Lloyd Harbor. The Town Board's position was that the subject territory extended to the west of the high-water mark on the easterly shore of Cold Spring Harbor and therefore was outside of Huntington. The court ruled in favor of the petitioner. It held that *Tiffany* (*supra*) was not controlling and should be limited to the question of the title to the actual property involved in that case, that is, the property between the high and the low-water marks in front of Tiffany's upland. The discussion of the boundary line between the two towns indicated generally that it was a line which was applicable in the determination of both jurisdiction and title. The court stated that the line located by the 1860 determination of the State Engineer and Surveyor was the one described in the royal patents and that the two towns had acquiesced in such line through the 70 years between the time of the said 1960 determination and the time of the commencement of the *Jennings* litigation. The court also noted that Huntington had not been a party in *Tiffany* and, hence, it was not bound by that earlier decision. The court further disparaged its hold-

ing in *Tiffany* on the ground that the 1860 determination of the State Engineer and Surveyor had not been called to its attention and was not referred to in its opinion in that case.

Before coming to the firm conclusion that the *Jennings* line is the title line between the two towns, we still must consider the proofs in support of Dredging's contention that, although the Andros patent gave the Town of Oyster Bay title to underwater land in the harbor, the town subsequently had been divested of such title. These proofs consisted of an abstract of several chains of title to property, including both upland and underwater land, in and about the area in question, taken from 30 deeds and from several other different types of transfers or records of property, dating from 1712 to 1953, together with certified copies of two of the deeds and of a '' proprietor's rights card,'' all involving private persons; and also a map, made on the basis of data in the abstract and on the basis of data from official records, which would show that some of the property encompassed in the abstract lies in part of the inner harbor. These proofs are entirely inadequate to support any affirmative finding. Nothing in such proofs relates to any definitive location of a boundary line between Oyster Bay and Huntington, and nothing was adduced at the trial to establish that the claimed chains of title had any lawful genesis.

We hold, therefore, that for all purposes, governmental and title, the *Jennings* line is the line between the Towns of Oyster Bay and Huntington. This is the logical and reasonable conclusion dictated by the evidence and by the prior decisions. From the point of view of town and county administration, we note that it is practical and feasible that this should be the line. It is well off the shorelines of both these towns; and neither town is subjected to undue limitations with respect to the use of its shoreline which would be present if the line were at high-water mark on its side of the harbor.

It remains for us to say that Dredging's liability must be limited to the materials it took out of that part of the bed of the inner harbor which lies to the west of the *Jennings* line.

We also are of the view that the learned trial court did not abuse its discretion in denying Dredging's motion to amend its answer so as to plead as a defense of settlement the payments which it had made to Oyster Bay. The trial court correctly refrained from considering such a defense as properly in the case on the basis of either Dredging's pleaded defense of good faith on its part or its denial of the allegation in the amended complaint that it had taken materials from the inner harbor '' without payment therefor and without offering to pay.'' As

a matter of fact, at the end of the plaintiff's case, Dredging's counsel conceded that the defense of settlement was not included in the defense of good faith. The evidence of the payments, of the negotiations which led to the payments, and of what was done with respect to determining or calculating the amounts of the payments was put into the case solely on the issue as to whether Dredging and officials of Oyster Bay had acted in good faith with respect to the subject matter of the controversy.

Our limitation of the damages against Dredging to the materials taken from the land west of the *Jennings* line is consistent with the rule that a plaintiff should not be permitted to succeed on a theory different from the one upon which he pleaded and tried his case (see *Rector etc. of Church of Holy Trinity* v. *Melish*, 4 A D 2d 256, affd. 3 N Y 2d 476).

Accordingly, the judgment should be modified on the law and the facts so as to provide that only so much of the underwater land in issue as lies to the west of the line established by the 1860 and 1875 determinations of the State Engineer and Surveyor, which is delineated on the above-mentioned Shipman-Whitney survey of 1873, and which has been here referred to as the *Jennings* line, belongs to the Town of Oyster Bay.

As so modified, the interlocutory judgment should be affirmed, without costs; the findings of fact contained or implicit in the decision of the court below which may be inconsistent with this opinion should be reversed, and new findings made as indicated herein; and the action should be remitted to the trial court for the trial of the remaining issues and for a final determination not inconsistent herewith.

UGHETTA, Acting P. J., BRENNAN, HILL and HOPKINS, JJ., concur.

Interlocutory judgment modified on the law and the facts so as to provide that only so much of the underwater land in issue as lies to the west of the line established by the 1860 and 1875 determinations of the State Engineer and Surveyor, which is delineated on the Shipman-Whitney survey of 1873, and which is referred to as "the *Jennings* line," belongs to the Town of Oyster Bay. As so modified, the interlocutory judgment is affirmed, without costs; the findings of fact implicit or contained in the decision below which may be inconsistent with the written opinion herein are reversed and new findings are made as indicated in said opinion; and the action is remitted to the trial court for the trial of the remaining issues and for a final determination not inconsistent herewith.