TRUSTEES OF THE FREEHOLDERS AND COMMONALTY OF THE TOWN OF SOUTHAMPTON, Plaintiff, *v.* THE FLANDERS CLUB, Defendant.

(Supreme Court, Suffolk Special Term, November, 1920.)

Lands under water — fresh water ponds — title in town of Southampton under ancient charters not divested by allotments which do not specifically include land under water.

In an action by the town of Southampton to have determined its ownership to the land under " Bellows pond," a body of fresh water located in said town, it was undisputed that by ancient charters the legal title to the property in question was vested in plaintiff. Apart from the town records which disclose that it was not the intention of the original layers out of

Supreme Court, November, 1920.          [Vol. 113.

the Canoe Place division of the Quogue purchase, in 1738, and of the Accabog division thereof in 1763, to allot the lands under the waters of the town, and the fact that there was no record in the history of the town that any land under water was ever specifically allotted, the plaintiff offered evidence showing that from time immemorial, all the fresh water ponds of the town had been generally used by its people and that private ownership of said ponds had never been asserted prior to the present action. It did not appear that the pond was ever used as a boundary in any description in defendant's chain of title except in the single instance of a deed of conveyance of a part of a lot in the Canoe Place division, in 1811, and no mention is made in any of the records of the disposition or use of said pond. *Held,* that plaintiff was entitled to judgment as against the contention of defendant that the pond passed with the title to the land in which it is situated by virtue of the rule that the legal presumption is that lands under the waters of small inland ponds belong to the adjoining land owners.

Action to determine ownership of land under water.

George W. Percy (John R. Vink, of counsel), for plaintiff.

Timothy M. Griffing & Robert P. Griffing, for defendant.

Young, J. This action is brought to determine the ownership to the land under the water of a fresh water pond known as Bellows pond, located in the town of Southampton, and having an area of about eighteen acres.

It is undisputed that by ancient charters the legal title to the property in question was vested in the plaintiff in this action.

When, according to the practice then existing, the Canoe Place division of the Quogue purchase was laid out in 1738, the westernmost lot in that division was designated as lot 38, and when somewhat later in 1763

the Accabog division of the Quogue purchase was laid out, the easternmost lot in that division was designated as amendment No 1 to lot 18. These two lots adjoined each other, lot 38 being to the east of amendment No. 1. It was conceded upon the trial that Bellows pond is within the boundary lines of said lot 38 and amendment No. 1.

It is the contention of the defendant that the land under the water of this pond, as well as the upland adjoining it, was allotted by the ancient allotments of the town and that the title in that way came to those from whom the defendant derived its title.

It is the contention on the part of the plaintiff that the land under the waters of the pond never was allotted by the town, and that title to it remains in the plaintiff by virtue of the original charters.

It is not claimed that any of the upland adjoining the pond was not allotted. The defendant's title to this upland, a large acreage, around the pond is undisputed.

It is unquestionably the law in this state that there is a presumption that lands under the waters of small inland ponds belong to the owners of the adjoining lands. See *Gouveneur* v. *National Ice Co.,* 134 N. Y. 355. While the ancient records, offered in evidence for the purpose of establishing defendant's title, are quite uncertain and confusing, certain points therein referred to nevertheless seem to be well established. It is admitted that Bellows pond is the same body of water referred to in those documents as a " fresh pond near Red Crick," and "Red Crick pond." When the Canoe Place division was laid out in 1738, we find the following description was used: " Running westward on the south side to *tinanah* and then on a direct line northward to a *fresh pond near Red crick,* the southward part thereof to (be) a tree

marked with No. 38 by the pond, and still running northward to *Red Crick,* and so along the branch and by the side of the crick to the north side.'' The course above mentioned from Tiana northward to a fresh pond near Red creek is shown on defendant's map, exhibit O, as the course running north forty-one degrees, fifty-four minutes, ten seconds, west, and the course still running northward to Red creek and so along the branch and by the side of the creek to the north side is shown on said map by the course running north twenty-one degrees, forty-seven minutes, east. Lot 38 was the most westerly lot in this Canoe Place division, and when this lot was laid out we find the following description: '' No. 38 lies w. of the southward part of No. 37, running down to *tiana to the middle of the brook* and then northward to *the southward part of the fresh pond* and so to the country road *at Red Crick* to a tree marked with No. 38.'' The above courses northward from Tiana to the southward part of the fresh pond and so to the country road at Red creek to a tree marked with No. 38 are likewise shown on said map, Exhibit O, by the same courses above referred to.

When the Accabog division adjoining the Canoe Place division on the west was laid out the following description was used: '' Beginning at the going over at *Red Crick* and going southward to *a pine tree standing at the southern most part of Red Crick pond* about one pole and half from the pond, marked on four sides.'' The above course refers to the course on said map north twenty-one degrees, forty-seven minutes, east.

In 1782 the last division of the Quogue purchase was laid out and the northerly line of the last division is described: '' From thence, (a point on the Riverhead-Quogue Road) a due east line running to the head of

*Red Crick pond.''* And the easterly line of the last division is described as: " and from thence (head of Red Crick pond) southward to *Tiana* bounded east by the Canoe Place Division." The above boundary lines are shown on said map by the course north, eighty-four degrees, twenty minutes, west, and the course west, forty-one degrees, fifty-four minutes, ten seconds.

The points which undoubtedly can be relied upon as being fixed in these various descriptions are:

(1) The " going over at Red Crick," meaning where the Flanders Good Hound road crossed Red creek.

(2) Tianah, creek or brook, and

(3) The approximate location of the point at the southernmost part of Red Creek pond referred to in said descriptions.

This being so, it follows that the boundary line between lot 38 of the Canoe Place division and amendment No. 1 to lot 18 of the Accabog division runs either through or along Bellows pond. It would be impossible for the line to run directly from the southernmost part of the pond to the crossing at Red creek in any other way. It was shown by the defendant that the title to amendment No. 1 passed from the trustees to certain tenants in common from whom the defendant derived its title; and in like manner that the title to lot 38 passed from the trustees to other tenants in common from whom the defendant derived its title.

It seems to me, therefore, that the allotments in question from which defendant claims its title, must be deemed to have included the land under the waters of the pond, unless a contrary intention be discovered on the part of the town, the original owner, in making the allotments.

Supreme Court, November, 1920.  [Vol. 113.

It nowhere appears that any specific reservation of the pond was made in any of the allotments, grants or deeds. The plaintiff contends, however, that from the beginning it has held the title to the land under the waters within the whole township; that this ownership has been recognized by acts of the legislature and that it has during all of this period actually exercised such right of ownership to control and manage the waters within the boundaries of the town; that private ownership in the ponds and inland waters of the town does not exist, and has never been asserted, although there are numerous ponds within the township; that all such are and always have been held for the common use. The plaintiff points to the records of the town as showing that it was not the intention of the original layers out to allot the land under the waters of the town, and asserts that the records show the intention of the town to retain the title and control of the waters within its boundaries, and that this was done in pursuance of the original agreement made between the settlers in 1639, before they came to Long Island, by which it was agreed that no person should claim any interest in the waters of the new territory, but that it should be held for the common use of all.

Plaintiff further points to the opinion of Judge Brown rendered in the case of *Town of Southampton* v. *Mecox Bay Oyster Company,* 116 N. Y. 1, where he states at page 12: " As to the lands under water none were ever allotted or sold or made the subject of individual ownership. The absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time."

And again at page 15: " I can find no instance, until the origin of the present claim to Mecox bay, of any claim to individual ownership. If I have over-

looked any evidence of such as to uplands, it may be confidently asserted that none can be found as to the lands under the water. As to that species of property, the inhabitants of the town appear to have maintained inviolate the agreement of the original undertakers, made at the very inception of the enterprise as follows: ' Furthermore, no person nor persons whatsoever shall challenge or claim any proper interest in seas, rivers, creeks or brooks howsoever bounding or passing through his grounds, but freedom of fishing, fowling and navigation shall be common to all within the banks of the said waters whatsoever.''

The plaintiff also offered evidence showing that all the fresh water ponds of the town from time immemorial had been generally used by the people of the town and that private ownership of fresh water ponds had prior to this action never been asserted.

The defendant, on the other hand, contends that the pond in question passed with the title to the land in which it is situated, relying upon the well known rule already stated that " lands under the water of small inland ponds belong to the owners of the adjoining lands.'' It urges that this pond was not reserved by the town when the allotments were made, although the records of the town show frequent reservations by the town of streams for mill purposes, highways, etc. That ponds within the towns, such as Bellows pond, not being useful for mill sites, were practically valueless and so were not considered at all by those who laid out the various divisions and made the allotments, and that the trustees intended that when a tract of land was alloted which included a pond that the pond went with it.

My conclusion upon the whole case is that defendant's evidence is not sufficient to justify its claim to ownership of the land under the waters of the pond in question.

There is no record in the history of the town that any land under water was ever specifically allotted or sold.

I think it must be conceded that the policy of the town has always opposed such action.

It is most significant that the disposition of Bellows pond was never mentioned when the allotments were made; although the boundary line between the allotments, as has been shown, ran through or near the pond. Reservations of existing roads in these divisions were made and provision made for the laying out of a new road through one of the divisions to the very pond in question. The record shows that when the last division of the Quogue purchase was laid out the layers out reported as follows: "Furthermore we reserve a two-pole highway from Red Creek pond across the north end of said lots running westerly," etc.

It seems to me had the layers out intended to allot the pond in 1738 and 1763 they would not have made provision forty-two years after the Canoe Place division was laid out for a new highway to the pond across the land allotted, and it should be noted that this highway led to the pond from the layout of the last division of Quogue purchase, in which the boundary lines did not touch the pond. The purpose of this highway was assuredly to give the owners of this last division access to the pond, which would not have been done had the pond been previously allotted. In addition to this if it had been the intention of the town to allot the pond, some provision as to its use among the several owners adjoining the pond would likely have been made.

An examination of all the deeds shown in defendant's chain of title discloses but a single mention of Bellows pond, and that occurs in a deed, defendant's

Exhibit No. 2, Hildreth to Jagger, made in 1811, conveying a part of lot 38 in the Canoe Place division, where the description is as follows: " Bounded northerly by the country road leading to Riverhead, easterly partly by Samuel Sanford and partly by the land of Samuel Hildreth, running southerly to Quogue road and to the middle of the brook at Tiana on the south end of the west line; thence running northerly to the southward part of the Fresh pond and so on to the Country Road at Red creek."

It does not further appear that the pond was ever used as a boundary in any description in the chain of title and there is absolutely no mention in any of the records of its disposition or use.

The plaintiff is entitled to judgment with costs.

Judgment accordingly.