TRUSTEES OF THE FREEHOLDERS AND COMMONALTY OF THE TOWN OF SOUTHAMPTON, Plaintiffs, *v.* WILLIAM G. MORRISEY, JR., et al., Defendants.

Supreme Court, Trial Term, Suffolk County, December 22, 1947.

*George W. Percy* for plaintiffs.

*Joseph V. McKee* and *Arthur L. Reuter* for defendants.

HILL, J.   This is an action in ejectment involving title to lands under the waters of an eight-acre body of water located on the north side of Shinnecock Bay in Hampton Bays, Town of Southampton, Long Island (hereafter called Penny Pond).

The trustees of the freeholders and commonalty of the town of Southampton (hereafter called trustees) acquired legal title to all the lands within the bounds of the town of Southampton from the English Crown by virtue of the Dongan patent dated December 6, 1686, for the benefit of the town.   The trustees had ten years prior thereto acquired title to the same lands by the Andross patent granting to John Topping, Justice of the Peace, and fourteen others, for and on behalf of themselves and their associates, the freeholders and inhabitants of said town, their heirs, successors and assigns, " to have and to hold the same to their proper use and behoof forever: " stipulating that said lands should " have relations to the Town in general for the well government thereof; " and created said patentees a body corporate under the name of Southampton.   I can find no reason for the second deed unless it be to put at rest Indian claims or merely confirmatory.

Defendants claim that their title to the land under water in question originated in the so-called lower division of the Inaga Purchase which was laid out by the trustees on May 19, 1738,

and the lots drawn for in that same year. Fourteen lots were laid out in an area called " the bottom of Ponganquogue Neck " (now known as Ponquogue) and south of the Cross highway. The lots begin on the east side of the neck (where the lighthouse now stands). It was the practice at that time for the trustees to deed the undivided lands in the town to individuals who contributed a stipulated amount. After the lands had been divided into lots or parts the individuals contributing, then drew lots to determine his allotment. Defendants' land was included in the division of May 19, 1738.

From May 19, 1738, to the summer of 1946, no one claimed title to the land sued for herein at least to the extent of excluding baymen and fishermen from using the waters for fishing and taking shellfish from the bottom.

The chain of title reveals that the early deeds to the surrounding property contain provisions that " Penny Pond " be excluded. The language used reads " except as to any land covered by the water of the pond or creek aforesaid." Later deeds include the pond, viz., " and particularly all the estate title and interest of the party of the first part in and to the pond of about 8 acres included within the boundaries of the above described land, and the land under water covered by said pond."

The oldest residents of Southampton Town testified that as far as they knew personally or had ever heard Penny Pond had always been open to fishermen and baymen; that small craft including sailing craft had gone in and out of the pond.

On June 8, 1903, permission was asked of the trustees by the owners of Penny Pond to be allowed to dredge from Shinnecock Bay to the pond. A resolution passed at a meeting of the trustees on that day reads " permission asked and granted to dredge from Shinnecock Bay to Penny's Pond and deepen the water in the pond."

That part of the allotment of 1738, in defendants' chain of title, found in volume III of the Southampton Town Records at pages 97 to 105, inclusive reads: " Page 166. Southampton, May the 19th, 1738. An account of the laying out of the lower Division in Inaga Purchase * * * and to lay out the undivided land in said town * * * And then we laid out 14 lots in the bottom of Poganquogue neck lying on ye south side of ye cross highway, with the amendments belonging to them, and we began on the east side of said neck and laid out lot No 25 adjoining to the water or bay butting at the north end to the cross highway and the south end to the water or beach and

containing 37 acres, together with an amendment lying on the northward side of the cross highway butting at the west end up to the middle road or highway leading to the Good Ground, and at the East end to the water marked No. 25. containing 55 acres of land. And the lot No 26 lies on the west side of No 25 butting at the north end to the cross highway and the south end down to the water and contains 34 acres, together with an amendment No 26 lying on the north side of No 25 butting at the west end to the middle highway, and at the East end to the water and contains 55 acres. And the lot No 27 lies on the west side of No 26 and is 33 acres together with an amendment No 27 lying on the north side of No 26 and contains 55 acres, and the lot No 28 lies on the west side of No 27 still increasing westward and is 33 acres together with an amendment No 28 lying on the North side of No 27 bounded at each end as the amendments No 25 and 26 are containing 55 acres. And ye lot No 29 lies on the west side of No 28 and is 40 acres including part of the pond, together with an amendment No 29 lying between No 33 and 32, containing 60 acres. And the lot No 30 lies on the west side of No 29 and is 31 acres together with an amendment No 30 lying on the north side of No 28 and is 54 acres. And the lot No 31 lies on the west side of the lot No 30 and is 31 acres, together with an amendment No 31 lying on the north side of No 30 and is 55 acres. And the lot No 32 lies on the west side of No 31 contains 33 acres together with an amendment No 32 and lies on the north side of No 31 and contains 60 (Page 170) acres. The lot No 33 lies on the west side of 32 and is 32 acres, together with an amendment No 33 lying on the north side of No 29 and contains 54 acres. And the lot No 34 lies on the west side of No 33 and is 32 acres, together with an amendment 34 lying on the north side of No 33 and is 53 acres and ye lot No 35 lies on the west side of No 34 and is 33 acres with an amendment 35 lying on the north side of No 34 and is 53 acres and the lot No 36 lies on the west side of No 35 and is 50 acres with an amendment No 36 lying on the north side of No 35 and is 54 acres and the Lot No 37 lies on the west side of No 36 and is 70 acres with an amendment No 37 lying on the north side of No 36 and is 54 acres. And the lot No 38 lies on the west side of No 37 and is 105 acres adjoining all along to the long cove that parts of the Ram pasture and said lot butting at the north end to the cross highway and at the south end to the water with an amendment No 38 lying on the North side of No 16 containing 49 acres. The lot No 39 lies from the canoe place to the middle line or highway

at the good Ground all along the southward side of the Roade leading to Quagantuck and is on the Northward side of the amendment No 38 containing 118 acres.''

It is evident that the description to the property in question and on which the defendants rely, is general only.

I am of the opinion that the '' Layers out '' representing the trustees never intended nor did they deed to individuals any lands under water. The history of Long Island bears this out, not alone in Southampton but in other towns on Long Island. The tidewaters were for the use and benefit of all the residents of the various towns. Fishing was a major industry both for food and fertilizer. This view has been supported by our highest court. In the case of *Trustees of Town of Southampton* v. *Mecox Bay Oyster Co.* (116 N. Y. 1) relative to lands under water in the town of Southampton, the Justice who heard the case found: '' CULLEN, J. In some cases even, where benefit was thought to accrue to the community, it disposed of portions of land absolutely. At one time to raise money to discharge the expenses of the patent, the number of proprietary shares was increased. Grants of land were made to ministers and to smiths and millers to induce their settlement in the town. The waters of the Town were not allotted nor any interest of the proprietors thereon recognized. But these were always controlled exclusively for the benefit of the Town. Thus for near a century and a half the legal title to the common lands was assumed to have passed under the patents to the town, a construction of the patents so long acquiesced in and the foundation of the private titles to all the lands of a large community, should prevail even if it were conceded, that as an abstract legal question such construction was incorrect.'' On appeal this same proposition was affirmed. Judge BROWN writing for the court wrote (p. 12):

'' Instances are cited where the trustees disposed of the land absolutely. Grants were made to induce the settlement of mechanics and others in the town, but in no case was it ever assumed that the legal title was elsewhere than in the town, and all deeds were executed by the trustees.

'' All this as to the uplands. As to the lands under water none were ever allotted or sold or made the subject of individual ownership. The absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time.''

Again in the case of *Trustees of Town of Southampton* v. *Flanders Club* (113 Misc. 451, 458) YOUNG, J., in his decision wrote:

" There is no record in the history of the town that any land under water was ever specifically allotted or sold."

" I think it must be conceded that the policy of the town has always opposed such action."

As far as the records disclose, this case was never appealed.

We find that the Legislature in the year 1818 (L. 1818, ch. 155) in an act addressed to the trustees recognized the reservation to the trustees the management of waters, fishing, seaweed and production of the waters for the benefit of said town as they had power to do. Again in the year 1831 (L. 1831, ch. 283) the Legislature passed another law in which it was provided that the trustees have " sole control " and management of the fisheries, etc.

Judge Brown also decided in the *Mecox Bay Oyster Co.* case (*supra,* p. 15): " the inhabitants of the town appear to have maintained inviolate the agreement of the original undertakers, made at the very inception of the enterprise, as follows: ' Furthermore, no person nor persons whatsoever shall challenge or claim any proper interest in seas, rivers, creeks or brooks howsoever bounding or passing through his grounds, but freedom of fishing, fowling and navigation shall be common to all within the banks of the said waters whatsoever."

Regardless of the strict interpretation of a deed or allotment, the construction put upon it by all the parties interested especially one involving a civil community must carry great weight. This is especially true after more than two hundred and fifty years. Chief Judge Church in commenting on this type of evidence in *Trustees of Brookhaven* v. *Strong* (60 N. Y. 56, 71) said " These elements of title are very much strengthened by possession and user during the long period ".

The plaintiff should be given any presumption that the law allows especially on account of the nature of the property as in this case public property.

Courts will not upset vested titles after the lapse of hundreds of years except upon clear and strong proof — this is especially so when the public is involved. Having in mind that no claim was made by an individual to the ownership of the land in question until a very recent date; that the division of 1738 was by general description; that defendants, title if any sprung from the allotment of 1738, not by adverse possession; that a former owner asked for and was granted permission to dredge the pond; that it has been the policy of the town trustees to retain title to the tidewaters of the town for the benefit of all the residents and finally that it has been judicially determined that

the trustees never specifically allotted or sold any lands under water, it is my judgment that the plaintiff is entitled to a judgment ejecting the defendants from the land under the waters of Penny Pond.

Judgment accordingly.