William R. Geiler, J.
Plaintiff, owner of certain real property within the Town of Southampton, commenced this action to declare unconstitutional certain zoning ordinances enacted by the defendant Town of Southampton (hereinafter referred to as Town). The defendant Town served an answer to said complaint in which it basically denied the allegations of the complaint and along with defendant-intervenor Trustees of the Freeholders and Commonalty of the Town of Southampton (hereinafter referred to as Trustees), set forth certain counterclaims pursuant to article 15 of the Real Property Actions and Proceedings Law. The defendants, in effect, asserted that they, on behalf of the people of the Town of Southampton, have superior title and/or interest to certain portions of the real property claimed to be owned by plaintiff in its zoning action.
Plaintiff replied to the counterclaims of the defendants and took issue with the allegations contained in said counterclaims. The counterclaims and the reply thereto created questions as to title of certain real property located within the Town of Southampton.
What is the location of the area in dispute? The premises, which are the subject matter of the defendants’ counterclaims, are bounded on the south by the Atlantic Ocean and on the north by Shinnecock Bay. Dune Road bisects the subject premises east to west. The defendants, on the Atlantic Ocean side of Dune Road, claim the land lying south of the grass at the top of the dunes to the ocean itself.
The defendants claim to own the premises north of Dune Road, allegedly covered twice daily by the average high tide of the Shinnecock Bay. The premises are bounded on the east by Triton Lane and on the west by a line running 500 feet parallel to the easterly boundary of the Villagq of Quogue. The defendants also claim ownership to all of the “island” designated from time to time as Gull Island, Sedge Island and Frank’s Bog.
What, in effect, do the pleadings herein indicate. The issues may be summarized as follows:
1. Did plaintiff’s remote predecessors in interest have the right to convey legal title?
2. Does either defendant have title to the beach lands on South Beach in the Town of Southampton, lying between the average *870 high water line of the Atlantic Ocean and the southerly top edge of the sand dunes?
3. If plaintiff: has title to these beaches, are these beaches subject to an easement in favor of the inhabitants of the Town of Southampton?
4. Who has title to the ‘‘ island ’ ’ lying in the Shinnecock Bay and which has been known by the names Gull Island, Frank’s Bog and Sedge Island?
5. Does either defendant have title to any of the land lying north of Dune Road and which is below the average high water line of the Shinnecock Bay?
The Appellate Division in 34 A D 2d 618 ordered that all isssues of title raised in defendants’ answers be separately tried and said defendants are to proceed as if their claims, as to title in the counterclaims, had been asserted as an action in chief. The Appellate Division also ordered that the trial of the zoning issue be held after the issue of title has been determined. This decision will only deal with the questions of title.
This action, by its very nature, involves the tracing of chains of title going back to the earliest settlement of the Town of Southampton. Thus, the history of the early settlement and development of Southampton must be examined. The past must be explored in order to understand the present.
How did the development of Southampton come about? In the year 1639, eight men from Massachusetts executed an agreement known as “ The Disposall of the Vessel” for the purpose of establishing a permanent settlement on Long Island. The signatories of this agreement, who were later increased to 18, were known as the “ undertakers The agreement itself contained provisions for the establishment of a company, the procurement of a vessel and methods to be employed in finding a site and distributing the land (The First Book of Records, Books 1-4 of the Records of the Town of Southampton published in 1874).
The Earl of Stirling, by means of title allegedly derived from the British Crown, claimed ownership of all of Long Island. The undertakers secured a deed from one, James Farrett, a representative of the Earl of Stirling, in return for the consideration of 400 pounds. These early pioneers commenced building a settlement in the vicinity of the present Town of Hempstead. The Dutch settlers of New Amsterdam claimed all ownership of Long Island and thus strongly opposed the undertakers’ new settlement. The undertakers, in the face of this vehement opposition, left the settlement.
The undertakers, after returning to New England, sought redress from Farrett. Farrett, in order to quiet the undertakers, *871 delivered to them a new deed, purporting to convey all those lands lying between: “ Peaconeck and the eastern most point of Long Island with the whole breadth of the said island from sea to sea * * * excepting those lands already granted unto any person by me.”
The company, founded by the undertakers, landed at a harbor in “ Peaconeck ” Bay in June of 1640 and established a settlement in the vicinity of the area now known as the Village of Southampton (Adams History of the Town of Southampton, P- 51).
The land was divided among the settlers. Some of the lands were used for private homes and other lots were used for agricultural purposes. However, a large measure of the area was held as an “ undivided commons ” for use by all settlers (Adams, supra, pp. 61-62).
The townspeople were divided into two classes. One class was the “ freeholder and inhabitant ” and the other class was known as the “ proprietors ”. The freeholder and inhabitant had all the rights of any townsmen and could purchase land after the same was divided by order of the town. However, this class did not share in the proceeds from the sale of undivided lands. Only the proprietors shared in the proceeds from the sale of the undivided lands.
There were conflicting claims to the ownership of the lands settled by the original undertakers. The Dutch claimed ownership of these lands and the Colony of Connecticut claimed jurisdiction over all of eastern Long Island, including the subject area (Adams, supra, p. 88). The Dutch claims were forcibly extinguished in 1664 by the British seizure of New Amsterdam. Charles II, granted all the lands of New Amsterdam, including all of Long Island to the Duke of York, even though this grant was clearly contrary to the jurisdiction claimed by Connecticut (Bayles, Historical and Descriptive Sketches of Suffolk County, p. 33).
English control of Long Island was briefly interrupted when the Dutch regained control of New York in the early 1670’s. However, England won the war against Holland and English control of the colony was restored.
In 1674, a new patent was issued to the Duke of York. The Duke, eager to establish control over New York, appointed Edmund Andross Governor and gave him broad authority to govern the area. The new Governor ruled that all previous patents were invalid and required the various towns in Long Island to purchase new patents which were to be issued by him.
*872 In 1676 the Town of Southampton received the Andross patent. The patent was in the form of a grant and it ratified, confirmed and granted to certain individuals therein named “ for and on the behalfe of themselves and their Associates, the ffreeholders and Inhabitants of the said Towne, their Heires, Successors and Assignes ” a tract of land of which “ Their Southern bounds being the Sea ’ ’. The individuals so named were also granted ‘ ‘ all Rivers, Lakes, waters * * * to the said Towne, Tract of land and premises, within the limits and bounds aforementioned described, belonging or in any wise appertaining.”
Thus, these individuals were granted all the land presently within the boundaries of the Town of Southampton.
In 1686 a new Governor by the name of Thomas Dongan was appointed for the State of New York. The new Governor required the Town of Southampton to take a new patent known as the “ Dongjan ” patent. The new patent recited the Andross patent at length, and “ Granted Ratifyed Released and Confirmed ” to certain persons therein named, who are created a corporation “ by the name of the trustees of the ffreeholders and commonalty of the Town of Southampton ’ ’ and their successors, the same territory, without again describing if.
This vested the title to all land, not in the lawful possession of some individuals, within the boundaries named in the Town of Southampton. The legal title to this land ,jvas held by the Trustees of the Freeholders and Commonalty of the Town of Southampton.
These patents were confirmed by the act of the Colonial Assembly of May 6, 1691 and by the State Constitution of 1777 (Bradford’s Laws, 1694, p. 6; Colonial Laws of N. Y., I, 224-225).
A major portion of the unallotted land remaining in Southampton over the years and down to the beginning of the nineteenth century was sold at town meetings. The proceeds of the sales were shared only by the proprietors. The proprietors, anxious to increase the amount of money which would be given to them, asserted that their right to the proceeds of sales in the undivided lands of the town included a right to share in the products of the waters of the town. A controversy arose between the proprietors and the townspeople with reference to the proprietors’ claim to control such items as the fisheries, clam beds and seaweed throughout the town’s shores. A town meeting was held on December 23, 1816 for the purpose of solving these controversies between the proprietors and townspeople. A committee was appointed to ‘ ‘ confer with the committee of the Proprietors, that if the Proprietors will give up their exclusive *873 right to the waters in said Town, the Town at large will give up their right to the undivided land and meadows which the Proprietors claim. Also, for the Town at large to have free access to the waters in any part of said Town when they please, and to have all products arising from said waters ” (The Fourth Book of Records, Town Records 1-4, pp. 26-27).
The Town’s proposal was accepted by the proprietors and resulted in the enactment of chapter CLV of the Laws of 1818, passed on April 15,1818. The proprietors were now authorized to meet and elect trustees who “ shall have the same power to superintend and manage the undivided lands, meadows and mill streams aforesaid, as the trustees of the freeholders and commonalty of the Town of Southampton now have, and shall have full power to sell, lease, or to partition ” the said lands.
There seems to have been further controversy between the proprietors and inhabitants and thus a further act was passed on April 25,1831 (L. 1831, ch. 283), known as “ An Act declaring the Powers and Duties of the Trustees of the Freeholders and Commonalty of the Town of Southampton, in the County of Suffolk.” Section 5 of the act defined the powers and duties of the trustees and freeholders in the following language: “ § 5. The said trustees shall have the sole control over all the fisheries, fowling, sea weed, waters and productions of the waters within the said town, not the property of individuals, and all the property, commodities, privileges and franchises granted to them by the charter of Governor Dongan, in [1686], except so far as are abrogated, changed and altered by the laws of this state, passed in conformity to the constitution and not now belonging to individuals nor to the proprietors, by virtue of [Chapter 155 of the Laws of 1818] ; and they shall have power to make rules, orders and by-laws for the management thereof and the regulation of their affairs, and to impose such penalties ”.
On March 21, 1861, the proprietors, who traced their interest to the original “ undertakers ”, delivered a deed to plaintiff’s remote grantors and said deed (known as the “Post” deed) contained the following language: ‘ ‘ All the several tracts of salt or sedge meadow situated on such part of the south side of Shinnecock Bay in said town as are bounded on the east by allotted meadows of Pine division on the north by Shinnecock Bay on the west by meadow of George 0. Post, Erastus Foster & John H. Post or allotted meadow and on the south by the Beach and also including the Sedge Flat or Island opposite the premises hereinbefore conveyed. Together with all and singular the tenements hereditaments and appurtenances and rights belonging to or in anywise appertaining to the same. And all the *874 right, title and interest of the said parties of the first part therein. To have and to hold the same to the said parties of the second part their heirs and assigns forever. And the said parties of the first part for themselves and their successors in office do hereby covenant and agree to and with said parties of the second part their heirs and assigns, that they are now the lawful owner of the premises above granted and seized of a good and indefeasible estate in fee simple therein and have full right and power to sell and convey the same in fee simple therein and have full right and power to sell and convey the same in fee simple absolute that the same are free and clear of all incumbrances and that they the said parties of the first part for themselves and their successors in office will Warrant & Defend the said premises with the appurtenances unto the said parties of the second part, their heirs and assigns forever.”
The Town of Southampton and plaintiff’s remote grantors had conflicting claims to some of the subject property and in 1899 these antagonists attempted to reach a settlement of their differences. The plaintiff’s remote grantors quitclaimed to the Town all their interest in the islands mentioned in the deed of 1861 “ as long as same remained islands ”. The Town in turn quitclaimed to the grantees of the proprietors all the property described in the deed of 1861 with the exception of the islands and certain roads reserved for public use.
Why are defendants disputing plaintiff’s title to the subject premises if they acknowledge that these deeds were filed and recorded with the Suffolk County Clerk’s office!
The defendants claim that the proprietors never received legal title to the subject premises under the acts of 1818 and 1831, but merely received a power to sell and an equitable interest in the proceeds from the sale of the common and undivided lands of the Town.
In effect, defendants contend that the proprietors were only granted a power in trust over the subject premises and were not able to convey legal title.
The position taken by the defendants with reference to the act of 1818 is untenable as indicated by the court in the case of. Knapp v. Fasbender (IN Y 2d 212, 232) in the following language: “ To hold that trustees lacked the power to transact their business on their own resolution is to read into prior legislative acts * a restriction plainly not a part of the statutes, a restriction contrary to actual practices as revealed by official records and a restriction casting doubt on the security of tranfers of titles of great communities in Suffolk County.”
*875 Similarly the following words of Justice Cardozo in the case of Beers v. Hotchkiss (256 N. Y. 41, 66 indicate that defendants’ interpretation of the act of 1818 is erroneous. “ The act of 1818 must be read in the light of these conditions, notorious to the men who framed it. The aim was not to unsettle the old allotments or the titles built upon them. The aim, on the contrary, was security and peace. What had been divided was to be untouched, if division had been made according to the ancient forms. What was undivided, and nothing else, was to be the subject of the future sales.”
The books of the trustees of the proprietors are filled with records of conveyances made by that body over 150 years ago and a great injustice would now occur if this court disregarded the cases interpreting the act of 1818 and question the basis of transferring land on which the titles of so many of the property owners of the Town of Southampton are based (Beers v. Hochkiss, supra; Lawrence v. Town of Hempstead, 155 N. Y. 297).
The fact, that the proprietors had the right to convey legal title, does not in of itself mean that plaintiff received title to all of the subject premises. The court must now decide what property the plaintiff actually owns.
Does plaintiff have title to the beach lands on the south beach in the Town of Southampton lying between the average high water line of the Atlantic Ocean and the southerly top edge of the sand dunes?
In effect, the court must determine the southern boundary of plaintiff’s property and the meaning of the words “ bounded on the south by the beach ” as contained in the deed of 1861.
What is the meaning of the word “ beach ”? The Court of Appeals in the case_of Trustees of Town of East Hampton v. Kirk (68 N. Y. 459, 463) stated: “ The definition of the shore is an accurate defintion of a beach having respect to the nature and situation of both. Both words denote lands washed by the sea.”
“Beach” is defined in New York Jurisprudence (vol. 6, Boundaries, § 15) in the following manner: “ The words beach, shore, and seashore, in descriptions of lands bounded by tidal waters, are generally held to comprise the territory between high and low water, over which the tide ebbs and flows.”
This definition of “ beach ” has been followed by the Second Department as indicated by the case of Cook v. Howell (227 App. Div. 801). In this case, certain lands in the Town of Southampton were the subject matter of a deed from the proprietors and the boundaries of these lands were described as follows: *876 “ A certain land of meadow on the south side of Mecox Bay, it being lot No. 11, bounded on the West by lot No. 10 on the North by the bay, East by lot No. 12 and South by the beach.” The Justice at Special Term of the Supreme Court found “ that the Southerly boundary of said premises is the mean-high water mark of the Atlantic Ocean.” The Appellate Division affirmed his finding.
Defendants have filed a voluminous brief attempting to convince the court that it should not follow the traditional meaning of “ beach ” as defined by the courts of this State. This court, agrees with plaintiff that any change in the traditional meaning of “ beach ” at this late date would certainly violate the rights of plaintiff. The words of Justice Potter Stewart of the United States Supreme Court in the case of Hughes v. Washington (389 U. S. 290 297-298), are most appropriate with reference to defendants’ attempt to substitute a different meaning for the accepted definition of “beach”: “There can be little doubt about the impact of that change upon Mrs. Hughes: The beach she had every reason to regard as hers was declared by the state court to be in the public domain. Of course the court did not conceive of this action as a taking. As is so often the case when a State exercises its power to make law, or to regulate, or to pursue a public project, pre-existing property interests were impaired here without any calculated decision to deprive anyone of what he once owned. But the Constitution measures a taking of property not by what a State says, or by what it intends, but by what it does. Although the State in this case made no attempt to take the accreted lands by eminent domain, it achieved the same result by effecting a retroactive transformation of private into public property-without paying for the privilege of doing so. Because the Due Process Clause of the Fourteenth Amendment forbids such confiscation by a State, no less through its courts than through its legislature, and no less when a taking is unintended than when it is deliberate, I join in reversing the judgment.”
The 1861 deed which contained the words “ bounded on the South by the beach ” carried title to the average high water mark of the Atlantic Ocean and thus constitutes plaintiff’s southern boundary. Any other interpretation would amount to a public taking without just compensation and would be in violation of plaintiff’s constitutional rights.
Are these beaches subject to an easement in favor of the inhabitants of the Town of Southampton?
Defendants assert that an easement exists as a result of the same being reserved by the act of 1818. The pertinent language *877 of the act of 1818 is as follows: “ nothing in the afore recited act shall be construed to give the proprietors or their trustees any power to make any laws, rules or regulations, concerning the waters (other than mill streams) the fisheries, the sea-weed, or any other productions of the waters of said town, or in any manner or way to debar the inhabitants of said town from the privilege of taking sea-weed from the shores of any of the common lands of said town, or carting or transporting to or from, or landing property on said shores, in the manner heretofore practiced; which waters, fisheries, sea-weed and productions of the waters, shall be managed by the trustees of the freeholders and commonalty of the town of Southampton, for the benefit of said town, as they had the power to do before the passing of this act: Provided further, that nothing herein contained shall in any manner affect or alter the right, title or interest of any person, or the inhabitants of said town to any of the before mentioned premises.” (L. 1818, ch. CLV, § IV).
Plaintiff admits that the act of 1818 contained a reservation of an easement in favor of the public but such easement is limited to the shore between the high and low water marks of the Atlantic Ocean and not between the dunes and the high water mark.
How does the plaintiff arrive at this conclusion! Plaintiff points out that the act of 1818 proclaims that the rights of the townspeople exist only over the “ shores of any of the common lands of the Town”. The plaintiff reasons that the word “ shore ” is limited to that area which is between the high and low water mark and thus the act of 1818 gave the defendants no easement over the beach area in question.
Is plaintiff’s explanation tenable! Plaintiff’s definition of “ shore ” is valid if the drafters of the act of 1818 had employed that term to designate boundaries rather than usage.
Furthermore, plaintiff’s reasoning does not take into consideration the clear language of the court in the case of Trustees of Southampton v. Betts (163 N. Y. 454, 460), with reference to the act of 1818 and the reservation of the public easement.
The Betts case was an action in ejectment brought by the Trustees of the Town of Southampton against Betts, the alleged owner of a beach area within the Town of Southampton. Betts claimed ownership of the beach by virtue of a deed from the proprietors. The Trustees contended that the proprietors had no power, notwithstanding the act of 1818, to convey the beach in question.
*878 The Trustees’ argument in support of their claim was that the beaches of the Town had been “ common ” to all of the inhabitants and that the intention of the act of 1818 was to recognize the proprietors ’ interest merely in those lands which were undivided and which had always been used by the proprietors. The Trustees also argued that the beaches were in their very nature public and, in effect, could not be capable of private ownership.
The court, from the very outset, defined the area in controversy. The court stated that the action involved ‘ ‘ that portion of the shore of the ocean which lies above the high water mark ”. The court used the word “ shore” in its broadest sense. It spoke of beach or seashore in the same sense that it used the words “ shore or shore lands ”. It is perfectly clear that the court, in using these expressions, did not intend that these words be limited to the land below water. Otherwise, one would have to reach the incongruous conclusion that the court would use these words in definition of something which was never an issue in the case.
The decision of the Appellate Division is also a good example that the word ‘ ‘ shore ’ ’ can gain meaning depending upon the context in which it is used. The appellate court stated that the controversy did not involve lands under water but rather a strip of the “ seashore ” (21 App. Div. 435, 436).
The Court of Appeals, after defining the area of controversy, stated the following (163 N. Y. 454, 458-459, supra): “ The evidence shows that this beach, or seashore, as were other beach lands in the vicinity, was used for sea fishing and purposes incidental thereto, for watching for whales and purposes connected with their catch, for bathing and for carting away- of-wreckage deposited. Boats were hauled up and kept upon the shore; seines were spread out upon it and persons passed, and repassed, and occupied themselves upon it, in ways which would be usual to the inhabitants of a fishing village or settlement.”
The court rejected these activities as evidence of title and rejected the Trustees ’ claim of ownership to the beaches below the dunes. However, the court considered these activities as being entirely consistent with the reserved easement contained in the act of 1818 as indicated by the following language (supra, p. 460): “ The plaintiff’s evidence is consistent with privileges and an easement enjoyed by the public, in connction with a title and the possession in the trustees and it is wholly insufficient, in my opinion, to inject any doubt into the meaning, or effect, of the act of 1818. The act itself made a reservation with respect *879 to public easements and privileges, and that reservation was recognized in the deed to the defendant’s predecessor in title ”. (Emphasis added.)
How does plaintiff reconcile the clear decision in the Betts case, which holds that an easement existed in favor of the public over the premises lying between the dunes and the high water mark and its position that the public easement rights are limited to the shore between the high and low water marks?
The plaintiff states that the Betts case and the subject action are distinguishable. The distinguishing feature, as argued by the plaintiff, is that the deed in the Betts case reserved “ the right to the public of passing and repassing along the ocean shore, of bathing in the ocean and of landing boats ’ ’ and no such reservation is contained in the “ Post ” deed.
The court cannot concur with plaintiff’s position. The language of the court in the Betts case is clear, “ The act itself made a reservation with respect to public [uses] and privileges ’’. In other words, this easement was reserved by the act of 1818, separate and apart from the reservation contained in the Betts deed. Thus, the failure to mention this reservation in the “Post” deed is of no consequence. The distinction attempted by the plaintiff is without any meaningful difference. In fact, the reservation in the deed to Betts supports the defendants’ position in that it indicates that the proprietors recognized the existence of the public easement in the act of 1818 and exactly what area that easement encompassed. No amount of rhetoric can change the clear meaning of the Betts case and the decision, like a good vintage wine, becomes stronger with age.
This court holds that the act of 1818 reserved to the inhabitants of the Town of Southampton for all time a public easement over the subject beaches.
Who has title to the area in the Shinnecock Bay, alternately known as Grull Island, Frank’s Bog or Sedge Island?
A dispute arose between the Town of Southampton and plaintiff’s remote grantors, as previously noted, as to the ownership of certain land including the islands lying adjacent to the lands and beach on the south side of the Shinnecock Bay. The dispute was resolved by the exchange of quitclaim deeds dated November 2,1899 between the parties. Plaintiff’s remote predecessors in interest conveyed to the Town: ‘ ‘ All their right, title and interest of, in and to the islands lying adjacent to the lands and beach on the south side of Shinnecock Bay so long as they shall remain islands.”
The Town has not made any conveyance of these islands since 1899, nor has the Town permitted any adverse claim to infringe *880 upon its title to these islands. The record is replete with evidence of the Town’s activities which are indicia of title.
Plaintiff, despite the quitclaim deed of 1899 and the evidence of title in the Town, claims it owns the area in question known as Gull Island.
What is the rationale behind plaintiff’s assertion? Plaintiff argues that the language “ so long as they shall remain islands ”, contained in the quitclaim deed, created a determinable fee in the Town as to Gull Island and thus the Town’s title was divested without the necessity of any re-entry by plaintiff or its predecessors in title.
The defendants admit that the expression, “ so long as ” signifies a determinable fee. However, the defendants argue, and quite correctly, that the existence of a determinable fee and the ability of a grantor to create such a fee depends upon the existence of a fee, to begin with, in the grantor. In other words, one can not create a determinable fee in something which one does not own. The defendants argue, that prior to the exchange of deeds in 1899, plaintiff’s remote grantors had no interest in Gull Island, other than their interest as riparian owners in the possibility, that it might some day, coalesce with the main land.
The court is of the opinion that it is not necessary to determine whether plaintiff’s predecessors, the Posts, had title to Gull Island before the deed of 1899 or whether a determinable fee was created by the deed of 1899. The evidence is clear that Gull Island has always been an island. It was characterized by the proprietors as an island in 1861 when the Post deed was delivered. It has been shown to be an island in the 1889-1890 United States Geological and Geodetic Survey. The parties to the deeds of 1899 identified it as an island in November of that year and it was shown to be an island in 1903, in 1933 and is - still an island in 1971.
The only item of evidence, introduced by plaintiff by which this court might consider that the island attached to the main land, is the Cook Survey of 1900. However, this survey was not prepared for the purpose of showing a shore line. It was prepared for the purpose of indicating the road and rights of way as agreed to by the participants to the 1899 quitclaim deeds. The evidence introduced indicates that Cook’s field notes were inadequate to map a shoreline. It is difficult to ascertain from Cook’s field notes what the shore line was in 1900. The evidence in the record indicates that there could not have been marsh vegetation between the island and the main land in 1900. The parties to the 1899 deed stated it was an island in November, 1899. It *881 is hardly probable that Gull Island became attached to the main land approximately seven months later when Cook surveyed the roads and rights of way.
The evidence in the record clearly establishes Gull Island has always been an island and has not coalesced with the mainland.
What is the boundary of plaintiff’s land north of Dune Road which abuts the Shinnecock Bay? Is it the edge of the line of vegetation as claimed by the plaintiff? Is it the high water mark of the Shinnecock Bay?
There is no doubt that the Trustees of the Freeholders of the Town by the virtue of the Andross and Dongan patents, succeed to the sovereign rights of the English crown with regard to the nonnavigable waters of the Town. These rights were explicity confirmed by the Colonial and State Legislatures (People ex rel. Howell v. Jessup, 160 N. Y. 249). The court is aware that there is no recorded case which expressly states that the Town assumed the same sovereignty with reference to the navigable waters of the Town. Howe,ver, several cases have implicitly recognized that the Town has, or assumed sovereignty with reference to navigable waters (Trustees of Town of Southampton v. Mecox Bay Oyster Co., 116 N. Y. 1; Trustees of Town of Southampton v. Flanders Club, 113 Misc. 451; Trustees of Town of Southampton v. Morrisey, 191 Misc. 920).
The acts of 1818 and 1831 in view of the above, cannot be considered as a grant by the State but basically a legal recognition of an adjustment between the Town and the proprietors. This adjustment in turn may be characterized as a grant by the Town in its sovereign capacity to private individuals.
The defendants proved that the Shinnecock Bay was tidal in 1818 and thus would meet the definition of navigability which was in use prior to the revolution (People ex rel. Howell v. Jessup, supra). This prerevoluntionary criteria for determining navigability evidently was not followed by the courts of this State as indicated by the following language in the cage of Roberts v. Baumgarten (110 N. Y. 380, 383): “ To the rights of the crown the People of this state succeeded, upon their separation, and the title to the lands under water, where the tide flows and reflows, vested and remained in them. This rule has been uniformly recognized in the adjudged cases in the reports of this state, which discuss the title of the People to such lands. The courts in this country have gone even further and have not felt bound by the distinction that the flux and reflux of the tide is the controlling element in determining the character of our bodies of water. The reasons which dictated the rifle in Eng *882 land, where navigability of its waters depended upon tidal influences, were plainly inapplicable to our large inland rivers and lakes.”
The defendants also proved that the Shinnecock Bay was ‘ ‘ navigable in fact ’ ’, and thus met the present criteria followed by our courts to determine the navigability of a body of water (Waterford Elec. Light Heat & Power Co. v. State of New York, 208 App. Div. 273, affd. 239 N. Y. 629).
It therefore follows that a conveyance by a governmental agency of land fronting on a navigable body of water conveys title only to the high water line (Tuffany v. Town of Oyster Bay, 209 N. Y. 1).
Should this court disregard the above rules of law? Should this court give a broad interpretation to the act of 1818? The answers to these questions are best found in the case of Coxe v. State of New York, (144 N. Y. 396). The State Legislature in this case made a grant of precisely the same kind of land, tidal flowed marshes and swamps, which the plaintiff herein would have this court read into the act of 1818. The court held the grant invalid in the following language (pp. 405-407): “ But we think that .so far as the statutes referred to attempted to confer title to such a vast domain which the state held for the benefit of the public, they were absolutely void as in conflict with the Constitution of the state and of the United States. * * *
‘‘ There is nothing in the enactments to indicate that the grant was for any public purpose and none has been suggested; and if it could be upheld, it is obvious that such a result would establish the principle that a majority in the legislature is competent to convey to a private corporation, for private purposes, the land under all the tide waters within the jurisdiction of the state. The nature of the title and the power of the sovereign to alienate lands under tide waters have been a prolific source of judicial discussion from the earliest times, and, judging from the numerous recent decisions, the subject is still almost as fresh as ever. This is due mainly to the circumstance that the courts have never yet attempted to fix the precise limits of legislative power in that regard. It is very difficult and perhaps wholly impracticable to do so. The courts have been satisfied to develop and apply principles, from time to time, sufficient for the purposes of the particular case. It is quite sufficient now to say that wherever the line may be drawn between grants of this character which the legislature may and 'may not make, such a grant as this has never yet been upheld. The question is governed in this state by the rules of the comomn law, modified in *883 some respects by statute, and adapted by the courts to such changes of conditions as exist here. That the dominion and ownership of such lands is in the sovereign for the benefit of the public has long been settled. Such dominion and ownership of property generally implies the power of absolute disposition, but with respect to the land under navigable or tide waters an important limitation has been engrafted upon this power from the nature of the title. The title of the state to the seacoast and the shores of tidal rivers is different from the fee simple which an individual holds to an estate in lands. It is not a proprietary, but a sovereign right, and it has been frequently said that a trust is engrafted upon this title for the benefit of the public of which the state is powerless to divest itself. (3 Kent. Com. 545 [9th ed.]; 3 Wash. Beal Prop. 418 [4th ed.]; Could Law of Waters, §§ 18, 44; Angell on Tide Waters, 158; Smith v. Rochester, 92 N. Y. 463; Gann v. Free Fishers, etc., 11 H. L. 192; Illinois Central R. R. Co. v. Illinois, 146 U. S. 387; Hardin v. Jordan, 140 id. 371; Shively v. Bowlby, 152 id. 1; Saunders v. N. Y. C. & H. R. R. Co., 144 N. Y. 75.) * * *
“ When the general doctrines of the English courts on this subject are given full scope, the conclusion is inevitable that the Parliament and the Crown together were not competent to grant to a private corporation, for private purposes, the seacoast around the island below the shore line, without violating established principles of law. (Martin v. Waddell, 16 Peters, 367.) While I am not aware of any such restriction to be found in the Constitution of this state, in terms, yet, from the very nature of the question, it must be deemed to be inherent in the title and power of disposition. The title which the state holds and the power of disposition is an incident and part of its sovereignty that cannot be surrendered, alienated or delegated, except for some public purpose, or some reasonable use which can fairly be said to be for the public benefit. (Illinois Central R. R. Co. v. Illinois, supra; Shivley v. Bowlby, supra; People ex rel. v. Squire, 107 N. Y. 593; Buffalo, etc., R. R. Case, 111 id. 132,140; Hardin v. Jordan, supra.) ’ ’
The grant to the proprietors in 1818, if it also included the marsh property below the shore line of Shinnecoek Bay would be clearly invalid under the reasoning and holding of Coxe. Not only would such a grant be illegal, but furthermore, it is clear that no such grant was, in fact, intended.
How else can the plaintiff explain the statement of the Appellate Division in the Betts case (163 N. Y. 454, affg. 21 App. Div. 435, 436, supra): “ Clearly, such trustees [of the proprietors], *884 under the act of 1818, acquired no rights in property under water, and no power to sell or convey the same. The title to such property remained in the town.”
How does the plaintiff reconcile the following statement of the Court of Appeals in the Mecox case (116 N. Y. 1, 12, supra): “ As to the lands under water none were ever allotted or sold or made the subject of individual ownership. The absolute control and management thereof has been exercised by the trustees from the Dongan charter to the present time.”
How can the plaintiff justify its position with the following statement of the same court (p. 14) as to the effect of the acts of 1818 and 1831: “We have, then, not only an uninterrupted user, under the patents, by the town and its inhabitants for over two centuries recognizing the right of the town to control and manage the waters of the town and their productions, and to exercise over them all the rights which flow from ownership and possession of title, but the distinct recognition by the legislature of the state on two occasions that the title thereto was in the town.”
Has there been a relinquishment of title to these under water lands by the Town? There is no evidence of any relinquishment of title as implied by the plaintiff. This is evident by the language of the court in 1920 in the case of Trustees of Town of Southampton v. Flanders Club (113 Misc. 451, 458, supra): ‘ ‘ There is no record in the history of the town that any land under water was ever specifically allotted or sold. I think it must be conceded that the policy of the town has always opposed such action.”
Thus, there can be no doubt that the boundary line between plaintiff’s two parcels of property north of Dune Road and Shinnecock Bay is the high water mark of the bay.
What is the high water mark herein? What does the high water mark as applied to tidal'waters generally mean?
The term “ high water mark ” as applied to tidal waters may be defined as ‘‘ the line marked by the periodical flow of the tide, excluding the advance of water caused by winds, storms, and unusual conditions ” (6 N. Y. Jur., Boundaries, § 15, p. 157).
How is the high water mark determined? The "United States Supreme Court in the case of Borax, Ltd. v. Los Angeles (296 U. S. 10) stated that the proper determination of the location of a high water line at any given time involves the consideration of all the high waters at a particular place over a considerable period of time and that, under sound astronomical theory, the period considered should cover the past 18.6 years. In other *885 words, the average high water line is obtained by taking the mean of all of the high tides over a reasonable period of time. This standard for determining the location of the high water line is also used in the State of New York. (Matter of Board of Educ. Union Free School Dist No. 11 v. Nyquist, 51 Misc. 2d 902; Wood v. Maitland ,169 Misc. 484, mod. 259 App. Div. 796).
The uncontradicted evidence in the record indicates that the marshes lying north of Dune Road bear certain type of grasses. One type is spartina alternaflora. This type of grass thrives naturally in salt water areas only if the soil from which it grows is regularly inundated twice a day by the tidal flow. Spartina alternaflora may persist but cannot bloom or thrive in an area which, though thoroughly saturated with salt water, is not subject to daily tidal overflow.
Another species of grass found in this area is known as spartina patents. This species grows naturally in low lying areas above the daily tidal flow, but within the monthly range of spring tides. Inundation for more than a few days will cause decline in vigor and daily inundation will cause it to disappear.
Thus, lands, where spartina alternaflora predominates, must be below the high water line. Also, lands, where spartina patents is the dominant vegetation, must be above the high water line and is no longer subject to the daily tidal flooding.
The defendants herein introduced into evidence an area which contains strands of both spartina alternaflora and spartina patents. There is a general decline in the vigor of both of these in this area. As one goes through this area from the bay toward Dune Road, the spartina alternaflora declines, and in the higher areas of the intermediate zone it fails to flower and is in a stunted condition. Conversely, spartina patents, as one proceeds toward Dune Road through this zone, improves and, along the edge of Dune Road, appears to be thriving. The location of these strands and their relative stages of development indicate that within this strip of the marsh there can be found the location of the bay’s average high water line. The mixed strands of spartina patents and spartina alternaflora indicate that within this intermediate zone the usual distinction between land washed by the tide and that which the tide does not reach is clouded.
It.is in this area where the current average high water line is located. Spartina alternaflora and spartina patents react to changes in tidal flow patterns, but these reactions only occur gradually over the course of several growing seasons. Thus, the patterns indicated by these strands in this area are indicative *886 of the tidal flow for all the months of the year, over the course of several years. This area is graphically shown by defendants ’ Exhibit AAA. This exhibit, however, does not. contain a metes and bounds description and thus the court, although the average high water line is within this area, cannot spell out a more definite high water line. The parties indicated that they would stipulate to a metes and bounds description if the court found that the high water line is in fact the boundary of plaintiff’s premises.
The findings of this court may be summarized as follows:
1. The proprietors received legal title under the acts of 1818 and 1831 and not merely a power to sell with an equitable interest in the proceeds from the sale of the common and undivided lands of the Town.
2. The plaintiff has title to the beach lands on the south beach lying between the average high water line of the Atlantic Ocean and the southerly top edge of the sand dunes.
3. These beaches as defined above are subject to an easement in favor of the! Town of Southampton and said easement is located between the dunes and the high water mark.
4. The Town of Southampton has title to the area alternately known as Gull Island, Frank’s Bog or Sedge Island.
5. Defendants have title to the land lying north of Dune Road which is below the average high water line of the Shinnecock Bay.