OPINION OF THE COURT
Guy A. Graves, J.
Respondents move for summary judgment on an amended counterclaim for injunctive relief against petitioner because of his alleged violation of the Adirondack Park Agency Act (Executive Law, art 27); petitioner cross-moves for summary judgment dismissing the counterclaim.
The voluminous supportive materials included with the motion papers have been substantially considered previously by the court, and the facts and circumstances of this dispute
*755 between the parties have been reviewed extensively in the court’s decision of 5 April 1976 (Matter of Tyler v Board of Members of Adirondack Park Agency, 86 Misc 2d 818), appealed by respondents and affirmed by the Appellate Division, Third Department, in its decision of June 30, 1977 (58 AD2d 718).
Subsequent to the decision, petitioner withdrew his application for a variance, and respondents now seek injunctive relief under the counterclaim to compel petitioner to remove portions. of his buildings "which are closer than 28lá feet to the mean high water mark or line of Lake George.”
No proof was submitted that the "mean high water mark of Lake George” has ever been established.[1] Section 802 of the Executive Law supplying definitions for the Adirondack Park Agency Act was amended, effective July 27, 1976,[2] to add subdivision 37-a which provided that: " 'Mean high water mark’ means the average annual high water level.” What the "average annual high water level” of Lake George is has also never been established or promulgated either by the State or the agency.[3]
Respondent has cited cases[4] in support of the proposition that "computation of the mean high water mark at the Tyler shoreline on Lake George is simply accomplished by mathematically averaging the high water readings over a considerable period of time” and that the Adirondack Park Agency’s *756 surveyor, Earl Armstrong, did just that in locating the mark along the Tyler property.[5]
Assuming, arguendo, that the law of New York, as expressed in Dolphin Lane Assoc. v Town of Southampton (72 Misc 2d 868, affd 43 AD2d 727, mod on other grounds 37 NY2d 295, supra), provides for such a simple computation as indicated by respondent above, obvious problems arise in the case of Lake George:
What period of time is considerable? 20 years? 18 Vi years? 4 years? (Department of Environmental Conservation took control of Lake George outlet dam in summer of 1974.)
What consideration should be given to the fact that Lake George is an artificially controlled lake — controlled since 1974 by the State Department of Environmental Conservation and prior thereto by private enterprises operating since 1957 under section 38 of the Navigation Law? The long history of litigation over Lake George water levels indicates the conflicting interests and objectives regarding the uses of Lake George water which surely affected water levels, including of necessity the mean high water mark.
It would seem reasonable that the resolution of these questions should be accomplished through official action setting forth a clear and definite line.
It is noteworthy that the "mean low water line” of Lake George was established in 1963 by subdivision 4 of section 15-a of the Public Lands Law, providing that it "shall mean the water level of Lake George at one and eighty-one hundredths feet on the gage of the United States Geological Survey at Rogers Rock on Lake George known as Rogers Rock gage.” Those placing fill, for example, below the mean low water mark of Lake George, without an easement or license, have ample notice and a clear point of reference from which to work. Such is not the case for shoreowners on Lake George under present Adirondack Park Agency practice so far as the high level water line is concerned.
It is informative to note that in the 1976 amendments to *757 the Adirondack Park Agency Act, the "mean high water mark” for Great Sacandaga Lake was specifically defined in subdivision 2 of section 806 of the Executive Law, to "mean the spillway elevation contour, which is at seven hundred seventy-one feet elevation above mean sea level.” (L 1976, ch 899, § 6, eif July 27, 1976.) The justification for this amendment, as expressed in the legislative memoranda accompanying the bill, was that "[t]his amendment will eliminate confusion in the application of the shoreline restrictions to lands around the Great Sacandaga Lake.” (McKinney’s Session Laws of NY, 1976, p 2409; cf. statement in same legislative memoranda that definition of mean high water mark as the average annual high water level [Executive Law, § 802, § 37-a] is "based upon an observation both measurable and a matter of common experience to the layman-owner of the property” [p 2409] and "incorporates a workable standard for the measurement of shoreline set back restrictions [p 2409]”. The latter apparently could not be expected to suffice for Greát Sacandaga Lake; nor in the court’s opinion does it for Lake George which involves even more "layman-owners”.)
The penalties for violation of the Adirondack Park Agency legislation can be severe and costly.[6]
Although the objectives of the legislation are desirable and necessary, where State agencies have such power, the exercise thereof should not only be in a fair and equitable manner but also based on a definite, readily ascertainable and official standard. It should be no more difficult for the Adirondack Park Agency or the State to establish the precise "mean high water line” or the "average annual high water level” of Lake George than it was to pinpoint the "mean low water level” thereof or the mean high water mark for Great Sacandaga.
The failure to do so is a defect fatal to respondent’s motion for summary judgment.
Although the court decides the motions on the above reasoning, it notes for the record the history of this litigation and related "negotiations” between the parties. The appearance, but hopefully not the fact, of a pattern of bureaucratic harassment and uneven administration of the law emerges. Obviously, not all of the circumstances in the alleged violations *758 involved in the variance decisions[7] cited by petitioner are identical, but they indicate that in the same area on the lake in similar situations, variations were granted after a hearing with only $100 '-penalties assessed.[8] Petitioner’s application when submitted appears from the record to have been treated somewhat differently. The refusal initially to grant even a hearing and the subsequent dealings are suggestive of an interpretation by the respondents of their statutory powers which might well be characterized in this instance at least as overzealous, illogical, unreasonable and prejudicial to the applicant; needless to say there has been an intense and firm reaction thereto by petitioner.
Discriminatory enforcement as a defense to a criminal action derives from the Federal and State constitutional guarantees of equal protection of the law and the underlying concept — that persons similarly situated should be treated the same and that justice should be evenly and equally dispensed —is well accepted. (See, for example, People v Acme Markets, 37 NY2d 326.) No crime is involved in the instant case, but the possible penalties and consequences are severe. A useful and instructive parallel may be drawn.
Respondents’ motion denied.
Petitioner’s cross motion granted, with costs.

. An affidavit dated January 23, 1976, of Roy E. Cowen, III, an assistant hydraulic engineer involved in the management of the Lake George outlet dam for the New York State Department of Environmental Conservation, states, inter alia, that there has been no official computation of a mean high water mark or level for Lake George.
The significance of either the State or agency establishing such was referred to in this court’s decision directing a hearing on petitioner’s application for a variance. (Matter of Tyler v Board of Members of Adirondack Park Agency, supra.)

. Petitioner had completed the entire construction of his new dwelling prior thereto. Petitioner maintains that since this dwelling pre-existed the amendment, no zoning statute was applicable, and this obviated the necessity to apply for a variance.

. Daily checks as to water levels, along with other hydrological and meteorological data are now made by the Department of Environmental Conservation at the Lake George outlet dam, and apparently have been available since at least 1957.

. Dolphin Lane Assoc. v Town of Southampton (72 Misc 2d 868, affd 43 AD2d 727, mod on other grounds 37 NY2d 295) deals with tidal sea waters on Suffolk County’s shoreline. Ocean shorelines with well-established tidal data were also involved in Borax v Los Angeles (296 US 10). Stewart v Turney (237 NY 117, 124) dealt with grants from the State running to the low water mark of Lake Cayuga and clearly found "no analogy between this lake where the water changes its level at uncertain and irregular intervals and the seacoast where daily the tide ebbs and flows; where the line of ordinary high and low tide is fairly definite.”

. In their argument, respondents maintain that affidavits as to the survey made by Earl D. Armstrong, surveyor, and field measurements made by Ronald Cooper, an Adirondack Park project review specialist in the Adirondack Park Agency, indicate that the mean high water level line could have been ascertained by the landowner before he built. It is common knowledge that surveyors often differ in their measurements and conclusions in surveying the same premises; in Armstrong’s affidavit, he himself in describing his findings, avers that Cooper’s field measurements "differ by no more than one foot from those established by me”. In this instance, a miss by a foot may be regarded as good as a mile.

. Removal of the encroachment, if variance not granted. Possible criminal proceedings for deliberate or reckless violations, as well as the civil penalties provided in section 813 of the Executive Law.
Prior to chapter 898 of Laws of 1976, section 813 imposed criminal sanctions (unclassified misdemeanors) upon violators.

. Matter of Wolfram S. Sabille; Matter of Melvin and Louisa B. Slopey.

. Numerous pre-existing violations of the shoreline restrictions set forth in the Adirondack Park Agency Act exist in this long-settled area.